[No. H012265. Sixth Dist. Apr. 28, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
H. JOSHUA DAYAN, Defendant and Appellant.

[Opinion certified for partial publication.*]

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III-subparts A, B & C, IV, V, VI and VII.

**COUNSEL**

Philip H. Pennypacker for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Joanne S. Abelson and Richard Rochman, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WUNDERLICH, J.—**

### I. *Statement of the Case*

Defendant Dr. H. Joshua Dayan appeals from a judgment entered after a jury found him guilty of felony and misdemeanor false imprisonment (Pen. Code, §§ 236, 237), five counts of misdemeanor sexual battery (Pen. Code, § 243.4, subd. (d)), and solicitation for prostitution (Pen. Code, § 647, subd. (b).[1] He claims there is insufficient evidence of solicitation, felony false imprisonment, and three misdemeanor sexual battery offenses. He further claims the court erred in admitting the prior testimony of a witness and evidence of uncharged acts, excluding evidence designed to impeach one of the victim/witnesses, and allowing a police officer to make a statement at the sentencing hearing.

We affirm the judgment.

---

[1]Unless otherwise specified, all further statutory references are to the Penal Code.

## II.  *Facts*

Viewing all of the evidence in the light most favorable to the judgment, we summarize the essential facts as follows. (See *People* v. *Mosher* (1969) 1 Cal.3d 379, 395 [82 Cal.Rptr. 379, 461 P.2d 659].)

### A.  *The Prosecution*

On the afternoon of September 1, 1992, Barbara O. called defendant, her dentist, and said she was experiencing intolerable pain and was unable to bite or chew. Defendant said she needed a root canal and asked her to come in right away. Barbara could not leave work at that time, and they arranged a late appointment at 5:30 p.m.

At defendant's office, he examined her and said he needed to perform a root canal. Barbara was surprised he said this because he had already told her. She also noticed that an instrument tray had already been prepared. Defendant said his assistants had left but that he could do the work without one.

Defendant put an anesthetic mask over her nose and gave her a painful injection. Suddenly, Barbara felt defendant's lips on the corner of her mouth, as though he were kissing her. She pulled off the mask and gave defendant a surprised look. She did not know whether defendant had meant to do anything and did not mention it. Defendant acted as if nothing had happened.

During the procedure, defendant asked if she wanted a glass of wine or champagne. She joked that she probably needed it. But when defendant asked where her husband and child were and if she wanted to stay a while and have some wine, she knew he was serious and declined.

Defendant took an X-ray and asked if she would help develop it. Barbara, who had some training as a dental assistant, agreed, and defendant led her to a small developing room. She proceeded to a corner, and defendant entered and closed the door behind him. He put the film into a machine and explained that it would be developed in seconds. She wondered why he asked for her help and began to feel that something was wrong, especially because the room was small and there was almost no room to move.

Defendant said he liked her and asked her to stay and have some wine with him. When she refused, he grabbed her shoulders and tried to kiss her, partially inserting his tongue in her mouth. He also reached underneath her shirt and touched her breast. She testified that he was trying to get her to fall

into his arms. She pushed him away, jerked his hand from under her shirt, and said she was married. Defendant persisted. He reminded her he had waited for her but then backed away. This enabled her to get by him and leave the room.

Since the root canal was not yet completed, Barbara went back to the examination room, hoping defendant had understood her refusal. Some time later, defendant returned with the X-ray. He acted as if nothing had happened. He invited her to stay one more time, but she refused.

When the procedure was over, Barbara collected her things and turned to leave but found defendant in the doorway with an arm outstretched. She thought, "[G]reat, now I have got to try and get by him again." As she attempted to walk by him, he grabbed her and asked her to stay a while. She said no. He became angry and said he had waited for her. He attempted to kiss her, pressed himself against her and then up against the wall. She resisted. He finally relented and let her pass.

Barbara made her way toward the exit, but defendant told her she needed another appointment and gave her a prescription. As she reached for the appointment card and prescription, defendant held her by the hand. He then grabbed her hair and jerked her head back. He yelled that he had stayed late waiting for her and implored her to stay a while longer. He then tried to kiss her and licked her lips. He said she was attractive and that he liked her. Barbara slugged him in the chest, cried, and said she had to go get her son. Defendant let go, and she left.

When Barbara met her husband and son, she was pale and crying. When her husband asked what was wrong, she said it was hard to believe but that defendant had grabbed her, held her against her will, tried to kiss her, and put his hand under her shirt. Her husband urged her to call the police. She was reticent because there was more work to be done on her teeth. Later, her husband called "911." Officer Stephen Gallagher of the San Jose Police Department responded and took a report.

The next day, Officer Charles Gould had Barbara come to the police station and call defendant. He recorded the call and a tape was played to the jury. Barbara told defendant she was canceling her appointment, felt uncomfortable about what had happened, and said she did not understand why he had kissed her, tried to "make out" with her, touched her breasts, and refused to let her go. Defendant initially deflected her questions, saying she was a very nice person but eventually apologized. He explained it was "not [his] nature" but then said, "We're all human." He promised not to do it again.

Later that day, Officer Gould called defendant, told him about Barbara's allegations, and asked him to give a statement. Defendant did so the next day. The interview was recorded and a tape played for the jury. Gould testified that when he told defendant that the previous conversation with Barbara had been taped, he swallowed constantly, perspired, avoided eye contact, and appeared very anxious. Defendant apologized for not having an assistant at his office and for taking Barbara to the X-ray room.

On September 23, 1992, the San Jose Mercury News published a report, describing the charges against defendant and asked those who might have had similar experiences to call the police. The report was also broadcast on television. In response to the notice, several other women came forward.

Krystal M. testified that she had been defendant's patient since 1989. He had always acted professionally until July 1991. During a visit, he twice brushed his arm against her breasts. Her boyfriend told her to pay closer attention to him, and on her next visit, defendant brushed her breast. Later, while reaching toward the instrument tray, he did it again, and she brought it to his attention. He promised not to do it again. However, he did it one more time.

At a visit the next month, defendant brushed against her breasts again. She told him to stop it. He was behind her. He had placed the tool tray on her chest, and whenever he picked up an instrument, he would brush his hand across her chest. Later, when the dental assistant left the room, defendant took off his glove and attempted to put his hand in Krystal's mouth. She stopped him, and he responded saying, "Why[,] don't you like the feeling of flesh against your tongue?"

When Krystal was at the reception desk with her daughter, her son, and Annette G., who worked at defendant's office, defendant offered her a deal, saying, "[I]f you like you can come into my office and do some favors for me, I'll take care of your bill for you." He also asked what she was doing with her boyfriend and said, "[Y]ou're much too pretty to be with that man." Annette G. testified that defendant said he "could give it to her better."

Several months later, Krystal returned to defendant's office because he promised to repair his previous work for free. This time when he brushed against her breasts, she became upset and left.

Patricia S. testified that she began working for defendant as a dental assistant in January 1992. After one month, he told her she was going to "work out" and asked her to approach him. As she did, he grabbed her and

tried to kiss her. She turned her head, and he caught her cheek. She pushed him away.

About a week later, he asked if they could go to her house, which was only a couple of blocks away, and during the course of her employment he repeated this request several times. He asked whether she was going to "let" him "have" her.

Patricia testified that defendant would often touch her breasts and buttocks and press himself against her while she was scrubbing instruments. She would tell him to get away and remind him he was married. He would complain that he did not sleep with his wife. Patricia quit because she could not tolerate his behavior. She admitted, however, that she did not cite his sexual advances as the reason she quit when she applied for unemployment insurance. She testified that she thought the problem was solved by leaving. Later, however, she did make defendant's advances known.

Patricia testified that when she was working for defendant, she and Annette G. would often converse about defendant's behavior. She said she signed a reprimand for talking too much because defendant threatened to fire one of them if they did not sign it. She testified that defendant reprimanded them because he knew they were talking about him. She denied that she was fired for poor performance.

Tammy K. testified at defendant's preliminary hearing, and because she was unavailable at trial, her prior testimony was read to the jury. She said that during an appointment on January 7, 1992, defendant adjusted her bib, placed instruments on her chest, and touched her breast several times. At one point, he expressly asked if he could do so. She refused. She said that at another appointment, he variously offered to reduce her bill and give her a tank of nitrous oxide or drugs in exchange for sex. She told him to "fuck off." Defendant told her to "get off [her] ass," get a job, and pay her bill.

Annette G. testified she heard defendant offer Tammy drugs in exchange for "head." She said Tammy called her later upset and related the "head" incident.

When Tammy originally spoke to the police, she thought the touchings might have been accidental, but she no longer believed they were because her new dentist had not accidentally touched her.

Annette G. worked for defendant from February 1991 through April 1992. She began as the receptionist, later became office manager, and being a

qualified dental assistant, substituted on occasion for the regular assistants. She testified that defendant often asked her about her sex life. She also said that from September 1991 to January 1992, defendant would come up behind her and touch her chest, nipples, sides of her thighs, and buttocks. He would also slap her buttocks as she walked down the hall. He would laugh when she told him to stay away from her.

Barbara H. testified that she was a patient of defendant for seven years and was satisfied with his work. However, during a visit in November 1991, defendant placed his instruments on her chest and, while cleaning her teeth, rubbed her breast back and forth with his forearm. She did not think anything of it at first, but as he persisted, she thought it was unusual. On another occasion, he grabbed her in a hallway and kissed her on the lips.

Anita A. testified that when she first visited defendant's office in September 1991, he flirted with her, grabbed her cheeks, and said she was "so pretty." She said he brushed his lips against her face and would have kissed her had she not turned her head. She told him to stop without making a scene. At a later visit, however, he placed his palms on her breasts. She gave him a look. Another time, defendant grabbed and then rubbed his lips against her cheek.

### B. *The Defense*

In general, defendant denied the allegations of inappropriate, improper, and intentional sexual conduct toward all of his accusers. Several of his patients described him as honest, compassionate, and professional.

### 1. *Barbara O.*

Heidi Sondernow, defendant's receptionist, testified that *she* spoke to Barbara O. on the telephone on September 1, 1992, and she then told defendant about the call. Defendant asked his assistant Lena Cardriche to stay a little later, but when Barbara had not arrived by 5:15 p.m., defendant opined that it did not appear she was going to show up, and Lena Cardriche left. He wrote a prescription for Barbara, which he was going to tape to the door, did some office work, and was about to leave when she arrived.

Defendant proceeded with the examination. He planned to give her an injection for pain, but she asked for gas. He then set up the tray for the root canal and gave her an injection. As he was working, Barbara complimented him on his "pretty blue eyes." He testified that he kept his mask on at all times and denied kissing her.

Defendant said that Barbara mentioned her dental training and asked to see her X-ray being developed. She followed him to the developing room and remained in the doorway while he developed the X-ray. He said that his hands were in the machine at all times.[2] They then returned to the operatory for some additional work. When he was finished, he gave her an appointment card and a prescription. He denied touching or grabbing Barbara and said he would not have tried to kiss her because there was a risk of disease. Although he denied offering her wine, he admitted he might have done so as a "joke." He also admitted that he told her he had stayed late for her.

Defendant claimed that he apologized to Barbara on the phone only for putting his arm around her and for being a "little bit mean to her" for being late. He claimed it was part of his culture to use the words "sorry" and to "apologize" often.

### 2. *Krystal M.*

Defendant admitted occasionally putting tools on patient's chests, but he denied intentionally touching Krystal M., saying he may have accidentally brushed against her during a complicated procedure. He denied that she accused him of touching her during a visit or that he took off his gloves while working on her mouth.

### 3. *Patricia S.*

Defendant denied any inappropriate sexual conduct toward Patricia S. He testified that she was reprimanded a number of times for dropping instruments and returning them to the tray and for talking to patients about personal matters, such as her abortion. He did not fire her because he wanted staff consistency for his patients and because of a shortage of assistants.

### 4. *Tammy K.*

Defendant denied asking to touch Tammy's breasts or touching them. He said he did not like giving her gas because he knew she had a drug problem. He said it was not his custom to use gas and that the tanks at his office were there because of the previous dentist who occupied the space.

### 5. *Annette G.*

Defendant denied any improper conduct toward Annette G. He said she was unprofessional at the office, talked on the phone, and asked patients personal questions. He reprimanded her for talking to Patricia S. too much.

---

[2]Dr. Susan DiBene, who had previously worked for defendant, testified that the type of X-ray used did not require a dark room, one must wear gloves to develop the pictures, and one's hands must remain in a tank during the process.

Ellen Reyes, defendant's hygienist, and Dr. Susan DiBene, who had worked for defendant, testified that Annette had a poor reputation for honesty and veracity and tended to exaggerate and tell lies.

Sandra Steed, who handled insurance matters for defendant, testified that Annette had difficulty being told what to do, lied, and talked on the phone too much.

### 6.   *Barbara H.*

Defendant said it was possible he brushed up against Barbara H. but denied intentionally touching her breasts. He said that after an appointment in June, she hugged him and called the next day for a lunch date.

### 7.   *Anita A.*

Defendant testified that an assistant was usually present when he worked on Anita A. and that he might have inadvertently touched her breasts during a complicated procedure.

### III.   *Sufficiency of the Evidence*

### A.-C.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

### D.   *Misdemeanor Sexual Battery*

▮   Defendant claims there is insufficient evidence to support his convictions for misdemeanor sexual battery against Krystal M., Tammy K., and Barbara O. Specifically, he asserts that there is no evidence the touchings that underlie these convictions involved direct contact with his or the victim's *skin*. This claim is legally untenable.

Section 243.4 proscribes various forms of sexual battery, i.e., unlawful touching of "intimate parts." The more serious forms are defined in subdivisions (a), (b), and (c), which makes violations punishable either by a county jail sentence not exceeding one year or by a prison term.[4] The definition of "touches" applicable to these subdivisions is "physical contact *with the skin* of another person whether accomplished directly or through the

---

*See footnote, *ante*, page 707.

[4]Violation of these subdivisions are "wobblers," i.e., either a felony or misdemeanor, depending on whether jail or prison time is imposed. (§ 17; see *In re Jovan B.* (1993) 6 Cal.4th 801, 808, fn. 2 [25 Cal.Rptr.2d 428, 863 P.2d 673].)

clothing of the person committing the offense." (§ 243.4, subd. (e), italics added.)

Defendant was convicted of violating section 243.4, subdivision (d), which defines *misdemeanor* sexual battery. This subdivision defines "touches" as being: "physical contact with another person, whether accomplished directly, through the clothing of the person committing the offense, or through the clothing of the victim." (§ 243.4, subd. (d)(2).)

The definition of "touches" in section 243.4, subdivision (d) is different from that in subdivision (e) in two ways: it does not expressly require actual contact with the skin, and it applies to touching through the clothes of the victim. These differences make the misdemeanor definition broader than the felony definition and thereby reflect a legislative intent that subdivision (d) proscribe a wider variety of conduct than subdivisions (a), (b), and (c). This intent is also revealed by the fact that subdivisions (a), (b), (c), *but not (d)*, require that the victim be restrained or medically incapacitated.

With this in mind, we conclude that unlike section 243.4, subdivisions (a), (b), and (c), subdivision (d) does not require actual contact with skin. (See 1 Witkin & Epstein, Cal. Criminal Law (2d ed., 1994 pocket supp.) Crimes Against the Person, § 434, p. 91.) To conclude otherwise would restrict the scope of subdivision (d) and thereby frustrate its purpose. The fundamental rule of construction, requires that statutes be interpreted to give effect to the Legislature's intent. (See Code Civ. Proc., § 1859; *DuBois* v. *Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 382, 387 [20 Cal.Rptr.2d 523, 853 P.2d 978].)

Such a conclusion would also render superfluous the express requirement of skin contact in section 243.4, subdivision (e), and thus violate rules of construction to the effect that these statutes be considered as a whole, each part given effect, every word given significance, and constructions which render some words surplusage avoided. (see Code Civ. Proc., § 1858; *California Mfrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836]; *Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672]; *In re Bandmann* (1958) 51 Cal.2d 388, 393 [333 P.2d 339].)

In sum, defendant's claim fails due to its erroneous legal premise: that his misdemeanor convictions rests upon a finding of skin contact of some sort between him and the victim.

Defendant argues, that such a finding was required here because the court instructed the jury it had to make it.

We do not fault the trial court. It gave the standard CALJIC instruction for misdemeanor sexual battery. (CALJIC No. 16.145 (1991 rev.).) That instruction provides, in relevant part, " 'Touches' means physical contact with the skin of another person whether accomplished directly or through the clothing of the person committing the offense, or through the clothing of the alleged victim." (CALJIC No. 16.145 (1991 rev.) (5th ed. pocket pt.).) Although the use note expressly acknowledges that the definition of "touches" in section 243.4, subdivision (e), is "narrower" than that found in subdivision (d), the instruction includes a requirement of skin contact not found in subdivision (d). Given our discussion, the instruction is legally erroneous and should be redrafted to exclude any requirement of skin contact.

That the trial court here gave an erroneous instruction *beneficial* to the defendant does not provide him with a reason to complain on appeal. Defendant cites no authority for the startling proposition that if a court's instruction erroneously *adds* an element to an offense, a conviction must be reversed when there is insufficient evidence to support the added, but legally unnecessary, element. We doubt that such authority exists. Moreover, we fail to see how affirming a conviction when there is otherwise sufficient evidence to support it violates any of the defendant's rights.

IV.-VII.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

VIII. *Disposition*

The judgment is affirmed.

Bamattre-Manoukian, Acting P. J., and Mihara, J., concurred.

*See footnote, *ante,* page 707.