[No. G039806. Fourth Dist., Div. Three. Mar. 3, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHMAN EM, Defendant and Appellant.

## COUNSEL

Gregory Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Jeffrey J. Koch, Pamela Ratner Sobeck and James Flaherty, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**FYBEL, J.—**

### INTRODUCTION

Defendant Richman Em appeals from a judgment finding him guilty of the first degree murder of Miguel Davila, and from the two consecutive 25-year-to-life sentences imposed on him. Mr. Davila was the innocent victim of a

murder during a robbery by gang members, including defendant. We affirm. Substantial evidence supported defendant's murder conviction. Defendant was charged with aiding and abetting or being part of a conspiracy to commit the underlying crime of robbery, and was convicted of murder based on the felony-murder doctrine. Defendant's sentence is not cruel or unusual punishment under either the California Constitution or the United States Constitution even though defendant was 15 years nine months old when Mr. Davila was murdered.

### STATEMENT OF FACTS AND PROCEDURAL HISTORY[1]

Shortly after midnight on May 11, 2006, while sitting in his parked police cruiser, Garden Grove Police Officer David Scroggins heard four shots fired nearby. He looked toward a self-service carwash across the street from where he was parked, and saw two people running. Officer Scroggins saw a Toyota Corolla emerge from the carwash; he followed it and initiated a felony vehicle stop. Four persons were in the car: defendant, Narong Thongdeng, Joshua Richards, and Sharon Pech. A handgun was partially concealed below the driver's seat, and a blue-and-white bandana was on the backseat.

Another officer, Timothy Kovacs, was dispatched to the carwash, where he found Mr. Davila in the driver's seat of his car. Mr. Davila had been shot several times. Officer Kovacs asked him what had happened; Mr. Davila replied, "they shot me." When asked who had done this, Mr. Davila replied, "two Asian guys" who were wearing bandanas. (Richards is not Asian; defendant is Asian.) Three bullet casings were found in Mr. Davila's car, and one was found outside the front passenger side door.

Mr. Davila died as a result of exsanguination. An autopsy revealed four bullets had penetrated Mr. Davila's body; two had caused the fatal injuries.

Later in the morning of May 11, defendant was interviewed at the police station by Detectives McLeod and Ashby.[2] Defendant admitted he was "jumped into" the Exotic Family City Crips (EFCC) gang in January 2005; the gang had about 30 members, most of whom were Cambodian. Defendant's moniker was "Lolo."

Defendant told the officers he had met Thongdeng, whose moniker was "Joker," a few days before the shooting. He had met Richards, whose

---

[1] In accord with our standard of review on appeal, we present the facts in the manner most favorable to the judgment. (*People v. Dayan* (1995) 34 Cal.App.4th 707, 709 [40 Cal.Rptr.2d 391].)

[2] Defendant did not testify at trial. The facts regarding the police interview come from the audio recording of the interview, which was played during trial, and the transcript of the interview, which was provided to the jury.

moniker was "Thug," the previous day. Thongdeng and Pech picked up defendant in Wilmington and drove to Long Beach about 10:30 p.m. on May 10. They picked up Richards, drove to Garden Grove, and pulled into the carwash. Defendant initially told the officers he got out of the car to urinate, heard gunshots, and saw Thongdeng running back to the car. Defendant further said that, after he hopped back in the car, Thongdeng tossed a gun to him; defendant slid it under the driver's seat before the car was stopped by Officer Scroggins.

As the interview continued, defendant changed his story. Ultimately, defendant stated that, after he urinated, he went back to the car, where Thongdeng and Richards said, "they wanted to steal [Mr. Davila's] car and stuff." Richards had a gun in his pocket, and had given it to Thongdeng when they arrived at the carwash. Defendant and Richards told Thongdeng "it's on" him if he wanted to do it. Defendant stated, "I didn't know he was going to shoot him. I thought he was just going to take the car." Defendant saw Thongdeng demand money and car keys from Mr. Davila, and then saw Thongdeng shoot Mr. Davila.

When defendant, Thongdeng, and Richards got back in the car, Richards said to Thongdeng, "[m]an, I should have never gave it [the gun] to you. I knew you was going to pop him." When one of the detectives asked defendant, "[w]hat'd you and [Richards] say when [Thongdeng] came up with the idea to rob this guy," defendant responded, "we didn't say nothing. It was like . . . we just said it's on you . . . . [¶] . . . [¶] We didn't say nothing. We just said it's on you if you want to do it and he said, yeah, I'm a . . . he's just like, 'Well, give it to me. I'm gonna do it.' He just came up to him and did it."

At trial, a gang expert testified the EFCC gang was an Asian gang, also known as the Exotic Family City Crips. The gang had more than 80 members, and was located in Long Beach. EFCC members primarily commit crimes such as burglaries, home invasion robberies, auto thefts, assaults, shootings, stabbings, homicides, and crimes involving narcotics and firearms. The blue-and-white bandana found in the Toyota Corolla was typical of EFCC attire. Defendant had tattoos reading "EFCC" and "Lolo," as well as a tattoo of five dots, signifying he was an Asian gang member, and tattoos of an "E" and an "F" on his arms and shoulders. The dark clothing defendant was wearing at the time of Mr. Davila's shooting would assist a gang member in committing crimes at night without being seen, and would make it more difficult to identify him later.

The gang expert testified defendant, Thongdeng, and Richards were all members of the EFCC gang. Defendant had admitted his gang membership to

police officers in the past. The expert opined that defendant was an active member of the EFCC gang on May 11, 2006.

Defendant was charged in an indictment with murder (Pen. Code, § 187, subd. (a)) and active participation in a criminal street gang (*id.*, § 186.22, subd. (a)). The indictment alleged defendant was liable for the vicarious discharge of a firearm by a gang member, causing death (*id.*, § 12022.53, subds. (d), (e)(1)),[3] and the murder had been committed for the benefit of, at the direction of, or in association with a criminal street gang (*id.*, § 186.22, subd. (b)).[4]

A jury found defendant guilty of both counts, and found the enhancement allegations to be true. Defendant was sentenced to a total of 50 years to life. He was sentenced to 25 years to life for Mr. Davila's murder, and to a consecutive term of 25 years to life on the firearm enhancement. Pursuant to Penal Code section 654, sentence on the conviction for active participation in a criminal street gang was stayed; pursuant to Penal Code section 12022.53, subdivision (e)(2), sentence on the gang enhancement was stricken.

DISCUSSION

I.

THE EVIDENCE IS SUFFICIENT TO SUPPORT THE JUDGMENT AGAINST
DEFENDANT.

Defendant argues there was insufficient evidence to prove he aided and abetted the commission of or conspired to commit any crime. " 'In assessing

---

[3] The firearm discharge enhancement in Penal Code section 12022.53, subdivision (d) requires the imposition of a consecutive term of imprisonment of 25 years to life if a defendant personally and intentionally discharges a firearm, causing death or great bodily injury: "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), Section 246, or subdivision (c) or (d) of Section 12034, personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life." Subdivision (e)(1) of section 12022.53 makes the enhancement applicable to a vicarious shooter, like defendant in this case, if it is proven that the crime was committed for the benefit of, at the direction of, or in association with a criminal street gang, and if any principal in the crime personally and intentionally discharged a firearm, resulting in death or great bodily injury: "The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved: [¶] (A) The person violated subdivision (b) of Section 186.22. [¶] (B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d)."

[4] Before trial, the trial court granted the prosecution's motion to dismiss allegations that special circumstances applied.

the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Steele* (2002) 27 Cal.4th 1230, 1249 [120 Cal.Rptr.2d 432, 47 P.3d 225].) We presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053 [99 Cal.Rptr.2d 1, 5 P.3d 68].) We may reverse for lack of substantial evidence only if " 'upon no hypothesis whatever is there sufficient substantial evidence to support' " the conviction. (*People v. Bolin* (1998) 18 Cal.4th 297, 331 [75 Cal.Rptr.2d 412, 956 P.2d 374].)

Defendant was charged with murder under a theory of felony murder. Defendant's liability for Mr. Davila's murder was based on aiding and abetting the commission of or conspiring to commit robbery; there is no dispute that Thongdeng was the actual shooter. To establish defendant's liability as an aider and abettor, the prosecution was required to prove defendant knew of Thongdeng's unlawful purpose, and intended to and did aid, facilitate, promote, encourage, or instigate Thongdeng's commission of the crime. (*People v. Prettyman* (1996) 14 Cal.4th 248, 259 [58 Cal.Rptr.2d 827, 926 P.2d 1013]; *People v. Beeman* (1984) 35 Cal.3d 547, 560–561 [199 Cal.Rptr. 60, 674 P.2d 1318].) Presence at the scene of a crime, alone, is insufficient to establish aiding and abetting liability. (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 529–530 [26 Cal.Rptr.2d 323].) To establish defendant's liability as a coconspirator, the prosecution was required to prove defendant intended to and did agree with Thongdeng and Richards to commit a robbery, defendant intended that one of them would commit the robbery, and one member of the conspiracy committed an overt act to accomplish the robbery. (*People v. Williams* (2008) 161 Cal.App.4th 705, 710 [74 Cal.Rptr.3d 405].)

Defendant acknowledges he knew Thongdeng had a gun and intended to rob Mr. Davila. Defendant also admits he moved "close" to where Thongdeng was standing when Thongdeng shot Mr. Davila. As he was dying, Mr. Davila told Officer Kovacs he saw "two Asian guys." However, defendant argues there was no evidence he had the intent to accomplish, encourage, or facilitate Thongdeng's robbery of Mr. Davila.

The evidence, and the inferences that can reasonably be drawn from it, fully support defendant's conviction. Mr. Davila told Officer Kovacs two Asian "guys" wearing bandanas shot him. Mr. Davila's statement was properly admitted under the dying declaration exception to the hearsay rule. (Evid. Code, § 1242.) From this evidence, the jury could reasonably infer defendant was wearing gang paraphernalia, and was close enough to Thongdeng when he approached Mr. Davila that defendant and Thongdeng

appeared to be together. Defendant and Thongdeng (as well as Richards) were members of a criminal street gang that regularly committed violent crimes, including auto thefts and home invasion robberies. Defendant hid the gun under the seat of the car as they left the scene of the shooting. When questioned by the police, defendant initially attempted to distance himself from Thongdeng at the scene of the crime.

Detective McLeod testified at trial about the manner in which gang members work together in committing crimes, including the use of backups to support the gang member committing the crime. Gang members rarely commit crimes on their own, but only bring along those gang members they trust when committing crimes. A gang gun would only be given to someone a gang member had complete trust in; Thongdeng gave the gun to defendant, and defendant attempted to hide it after the robbery and murder.

Defendant was an integral part of the robbery and, under the felony-murder rule, guilty of murder. Based on all the foregoing, we conclude the record contains substantial evidence of defendant's participation in the crime as an aider and abettor or a coconspirator.

## II.

### Defendant's sentence is not disproportionate to the crime, and therefore does not constitute cruel or unusual punishment.

Defendant argues his sentence, consisting of two consecutive 25-year-to-life terms, is unconstitutional under the California and United States Constitutions' bans on cruel or unusual punishment.[5] "Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment." (*People v. Martinez* (1999) 76 Cal.App.4th 489, 496 [90 Cal.Rptr.2d 517].) Penal Code section 12022.53, subdivisions (d) and (e)(1), requires the trial court to impose a consecutive sentence if the enhancement created by that section has been proven; therefore, the trial court was without discretion to impose the two 25-year-to-life terms concurrently.[6] The issue

---

[5] Defendant forfeited this argument by failing to raise it in the trial court in the first instance. (*People v. Norman* (2003) 109 Cal.App.4th 221, 229 [134 Cal.Rptr.2d 652].) We will nevertheless "reach the merits under the relevant constitutional standards, in the interest of judicial economy to prevent the inevitable ineffectiveness-of-counsel claim." (*Id.* at p. 230.)

[6] Penal Code section 12022.53, subdivision (d) provides, in relevant part: "[A]ny person who, in the commission of a felony specified in subdivision (a) . . . personally and intentionally discharges a firearm and proximately causes . . . death, to any person other than an accomplice, *shall be punished by an additional and consecutive term of imprisonment in the*

before us is not whether the trial court abused its discretion by failing to impose the indeterminate terms concurrently—which it was prohibited from doing—but whether the sentence the trial court was required to impose on defendant by statute constitutes cruel or unusual punishment.

## A. *California Constitution*

█ Article I, section 17 of the California Constitution prohibits infliction of "[c]ruel or unusual punishment." A sentence may violate this prohibition if " 'it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' " (*People v. Dillon* (1983) 34 Cal.3d 441, 478 [194 Cal.Rptr. 390, 668 P.2d 697] (*Dillon*).)

Under the California Constitution, we use a three-pronged test to determine whether a particular sentence is disproportionate to the offense for which it is imposed. First, we examine "the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society." (*In re Lynch* (1972) 8 Cal.3d 410, 425 [105 Cal.Rptr. 217, 503 P.2d 921].) Second, we compare the punishment imposed with punishments prescribed by California law for more serious offenses. (*Id.* at pp. 426–427.) Third, we compare the punishment imposed with punishments prescribed by other jurisdictions for the same offense. (*Id.* at pp. 427–429.) Defendant must overcome a "considerable burden" to show the sentence is disproportionate to his level of culpability. (*People v. Wingo* (1975) 14 Cal.3d 169, 174 [121 Cal.Rptr. 97, 534 P.2d 1001].) Therefore, "[f]indings of disproportionality have occurred with exquisite rarity in the case law." (*People v. Weddle* (1991) 1 Cal.App.4th 1190, 1196 [2 Cal.Rptr.2d 714].)

Defendant argues only that the sentence imposed on him violates the first prong of the test, namely, the nature of the offense and the offender, with particular regard to the degree of danger both present to society. We examine both the seriousness of the crime in the abstract and "the totality of the circumstances surrounding the commission of the offense . . . , including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts." (*Dillon, supra*, 34 Cal.3d at p. 479.)

█ There can be no dispute that murder is a serious crime, and that armed robbery and the use of a gun by a gang member in the commission of a crime present a significant degree of danger to society. Life sentences pass

---

*state prison for 25 years to life.*" (Italics added.) Murder is a "felony specified in subdivision (a)." (See Pen. Code, § 12022.53, subd. (a)(1).) Although defendant did not personally discharge the firearm, he was nevertheless subject to the enhancement. (See fn. 3, *ante.*)

constitutional muster for those convicted of aiding and abetting murder, and for those guilty of felony murder who did not intend to kill. (See *People v. Smith* (1986) 187 Cal.App.3d 666, 682–683 [231 Cal.Rptr. 897]; *People v. Kelly* (1986) 183 Cal.App.3d 1235, 1244–1247 [228 Cal.Rptr. 681].) Additionally, a sentence enhancement of 25 years to life is not disproportionate to a violation of Penal Code section 12022.53; the Legislature has determined that a significant increase in punishment is necessary and appropriate to protect citizens and deter violent crime. (*People v. Gonzales* (2001) 87 Cal.App.4th 1, 16 [104 Cal.Rptr.2d 247] (*Gonzales*); *People v. Martinez, supra*, 76 Cal.App.4th at pp. 493–495.)

*Dillon, supra*, 34 Cal.3d at page 479, on which defendant relies, holds that murder committed in the commission of a robbery is a serious crime presenting a high level of danger to society. In that case, however, our Supreme Court concluded the facts of the specific crime in question and the defendant's culpability weighed in favor of concluding the imposition of a life sentence constituted cruel or unusual punishment. (*Id.* at pp. 488–489.) Of course, the facts of *Dillon* were central to our Supreme Court's conclusion. The shooting in *Dillon* occurred during an attempt to steal marijuana plants the victim was cultivating. (*Id.* at pp. 451–452.) The defendant had previously overheard the victim threaten to shoot anyone coming on his property. (*Id.* at p. 451.) An accidental firearm discharge during the attempted robbery alerted the victim to the presence of the defendant and his cohorts. (*Id.* at p. 452.) The defendant heard the victim approaching, saw him carrying a shotgun, and, "[w]hen [the victim] drew near, defendant began rapidly firing his rifle at him." (*Ibid.*)[7] The facts in *Dillon* contrast dramatically with the ambush robbery and murder of Mr. Davila, an innocent person sitting in his car.

In considering how this particular crime was committed, and defendant's culpability, we consider the well-reasoned analysis of *Gonzales, supra*, 87 Cal.App.4th 1, which presents a similar factual pattern. In that case, three gang members, two 16 year olds (Steven Gonzales and Michael Gonzales, Jr.) and one 14 year old (Manuel Jimenez), were involved in a fistfight with two other youths. (*Id.* at pp. 6–7.) Jimenez was carrying a gun; during the fight,

---

[7] It is also significant that in *Dillon, supra*, 34 Cal.3d at pages 485–486, the trial court did not originally sentence the defendant to prison, but instead committed him to the former California Youth Authority. Indeed, the jury foreperson wrote a letter to the court after trial, "confirming the jury's unwillingness to return the verdict compelled by the felony-murder rule" (*id.* at p. 484) and "implor[ing]" the court to commit the defendant to the Youth Authority rather than sentencing him to state prison (*id.* at p. 485). When the defendant appealed, the People attacked the commitment order as in excess of the trial court's jurisdiction. (*Id.* at p. 486.) The Court of Appeal found the defendant was ineligible for commitment to the Youth Authority as a matter of law, leaving the trial court with no choice but to impose a life sentence on the defendant. (*Id.* at pp. 486–487.)

he shot one of the other youths in the head, killing him. (*Id.* at p. 7.) All three defendants were convicted of first degree murder, and the jury found true the allegations under Penal Code sections 186.22, subdivision (b) and 12022.53, subdivisions (d) and (e). (*Gonzales, supra,* at p. 7.) Each was sentenced to a total term of 50 years to life in prison. (*Ibid.*)

In rejecting Steven and Michael's claims that the sentences resulted in cruel or unusual punishment, Justice Epstein, writing for the appellate court, explained: "Steven and Michael base their arguments on the fact that they were aiders and abettors, rather than the shooter. They acknowledge, as they must, that first degree murder is an extremely serious crime, but they ask us to focus on the nature of the enhancement for vicarious use of the firearm. They characterize the acts they committed as engaging in a fistfight of which murder was the natural and probable consequence. Again ignoring the evidence that Jimenez openly carried a gun on the way to the fight, and that Michael called for him to shoot the victim during the fight, Steven and Michael emphasize that the jury did not find they knew Jimenez had a gun and intended to use it. Based on this mischaracterization of the evidence, they argue it is cruel and unusual to impose the additional 25-year-to-life enhancement. [¶] The evidence presents a more serious picture of the crime and the facts surrounding its commission. The defendants were gang members. Jimenez had borrowed a gun. He and Steven went to Michael's house the day before the shooting and Jimenez told Steven he had a gun. Jimenez took the gun with him on the day of the shooting to a barbecue in Azusa Canyon. After the barbecue, the defendants encountered the victims as they drove back to Michael's house. They got out of their car and went to attack the victim and his companion because of their belief that the two had flashed the signs of a rival gang, thus disrespecting Michael's pregnant girlfriend, who was in the car with them. Jimenez carried the gun openly as they advanced on Llamas, and he pointed it at him. Llamas lunged for the weapon and the fight ensued. At one point, Michael called for Jimenez to shoot Llamas. There was evidence that Jimenez shot Llamas while one or more of the other defendants was holding Llamas down. The bullet entered the top of Llamas's head and exited through his mouth. The path of the bullet was consistent with Llamas being on the ground in a prone position when the gun was fired. These circumstances are far more serious than defendants indicate. None of them is extenuating. [¶] The second factor is the nature of the offender and defendant's individual culpability. Steven had suffered a single prior juvenile case adjudication for possession of marijuana/hashish for sale. He argues that this relatively minor record weighs in favor of a finding of cruel or unusual punishment. It does, but the circumstances of Steven's participation in the fatal fight establish his individual culpability. . . . We find no constitutional violation in the imposition of the 50-year-to-life sentences on Steven and Michael." (*Gonzales, supra,* 87 Cal.App.4th at pp. 16–17.)

Defendant claims *Gonzales* is "manifestly different" from the present case because, he argues, the defendants in *Gonzales* were participating in a "gang payback assault" and held the victim down while Jimenez shot him. But *Gonzales* is similar to this case and we employ the same analytical framework in deciding the constitutionality of defendant's sentence. Whether a gang member holds the victim down, or accompanies a fellow gang member to commit an armed robbery, he or she is providing integral assistance to the commission of the crime. Indeed, the prosecution's gang expert testified gang members commit crimes together, rather than individually, because they provide assistance and support for each other.

We next address defendant's own culpability for the commission of the crime. Defendant argues the murder of Mr. Davila involved little planning, and points out Thongdeng, not defendant, pulled the trigger. The small amount of planning and randomness of the crime, however, do not negate the coldblooded nature of Mr. Davila's murder. The evidence established defendant and two of his fellow gang members came upon Mr. Davila, a 26-year-old man, alone in his car in a carwash around midnight, and decided to rob him and steal his car. Defendant knew Thongdeng had a loaded gun. Defendant, wearing gang paraphernalia, walked up to Mr. Davila's car alongside Thongdeng. Thongdeng demanded Mr. Davila's money and car keys, and then shot him multiple times. After Mr. Davila was shot, defendant provided no assistance to him, instead leaving him to bleed to death. Back in the car, defendant took possession of the gun used to kill Mr. Davila and tried to hide it. Although defendant did not shoot the gun himself, the robbery and murder took place with his culpable involvement. Defendant's participation in the crime was demonstrably not "passive," as described in the probation report.

Defendant also asks us to consider his age at the time of the crime, 15 years nine months, and his alleged "immaturity." Many California cases since *Dillon* have upheld life sentences, with and without the possibility of parole, for defendants under 18 years of age, against constitutional challenges. (See *Gonzales, supra,* 87 Cal.App.4th 1; *People v. Thongvilay* (1998) 62 Cal.App.4th 71, 87–89 [72 Cal.Rptr.2d 738] [upholding 25-year-to-life sentence of 17 year old convicted of felony murder]; *People v. Guinn* (1994) 28 Cal.App.4th 1130, 1145–1147 [33 Cal.Rptr.2d 791] [upholding a life-without-possibility-of-parole term for 17 year old convicted of robbery murder]; *People v. Hankey* (1989) 215 Cal.App.3d 510 [263 Cal.Rptr. 615] [upholding 25-year-to-life term for nonshooter convicted of robbery murder despite his youth, his lack of prior convictions, and possibility he did not intend to kill]; *People v. Harpool* (1984) 155 Cal.App.3d 877 [202 Cal.Rptr. 467] [upholding 25-year-to-life term for a youth convicted of robbery murder despite his age and no felony priors].)

■ When considering whether a sentence is cruel or unusual punishment, the defendant's age matters. (*Dillon, supra,* 34 Cal.3d at p. 479.) It is also manifestly true, however, that murder matters. (See generally *Kennedy v. Louisiana* (2008) 554 U.S. ___, ___ [171 L.Ed.2d 525, 128 S.Ct. 2641, 2650–2651] [imposition of the death penalty may be unconstitutional under the 8th and 14th Amends. to the U.S. Const. when the victim was not killed]; see also *Dillon, supra,* 34 Cal.3d at p. 479 [felony murder occurring during robbery "presents a very high level of . . . danger, second only to deliberate and premeditated murder with malice aforethought"].)

In contrast to *Dillon, supra,* 34 Cal.3d at page 488, where the defendant offered expert testimony as to the fact he was an "unusually immature youth," here the only evidence of defendant's immaturity is one conclusory statement in the probation report that defendant "presented himself as very frightened and is obviously immature." This statement by the probation officer is one factor, among many, to consider, but it is not dispositive of the question of the constitutionality of defendant's sentence.

Although defendant's prior record was not extensive, his previous juvenile adjudication was for possession of a concealed dirk or dagger (Pen. Code, § 12020, subd. (a)(4)), and he was placed on formal probation. One of the terms of his probation was to not associate with any members of the EFCC gang. Defendant had many probation violations, including violations relating to gang graffiti, and he was on house arrest, as the result of one of those probation violations, when he left his home with Thongdeng and Pech the night Mr. Davila was murdered. Defendant has proven himself to be completely resistant to the rules and structures of civilized society and the criminal justice system, and to be indifferent to basic social mores. The danger he presents to society is significant. Defendant committed this crime, not because he was in the wrong place at the wrong time, but because he has a complete disregard for the rule of law and lack of respect for human life.

■ Defendant was 15 years nine months old when Mr. Davila was murdered, and, according to the probation officer, he was immature. When balanced against the seriousness of the crime, defendant's active participation in Mr. Davila's robbery and murder, the senseless and coldblooded nature of the murder, defendant's prior gang-related criminal history, and the danger he presents to society, we hold defendant's sentence was not disproportionate to the crime for which it was imposed, based on the first prong of the *In re Lynch* test.

### B. *United States Constitution*

■ The Eighth Amendment to the United States Constitution states, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel

and unusual punishments inflicted." (U.S. Const., 8th Amend.) "The Eighth Amendment, which forbids cruel and unusual punishments, contains a 'narrow proportionality principle' that 'applies to noncapital sentences.' " (*Ewing v. California* (2003) 538 U.S. 11, 20 [155 L.Ed.2d 108, 123 S.Ct. 1179].) The appropriate standard for determining whether a particular sentence for a term of years violates the Eighth Amendment is gross disproportionality. That is, "[t]he Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime. [Citations.]" (*Harmelin v. Michigan* (1991) 501 U.S. 957, 1001 [115 L.Ed.2d 836, 111 S.Ct. 2680] (conc. opn. of Kennedy, J.), citing *Solem v. Helm* (1983) 463 U.S. 277, 288 [77 L.Ed.2d 637, 103 S.Ct. 3001].) Successful grossly disproportionate challenges are " 'exceedingly rare' " and appear only in an " 'extreme' " case. (*Lockyer v. Andrade* (2003) 538 U.S. 63, 73 [155 L.Ed.2d 144, 123 S.Ct. 1166].)

The companion cases of *Ewing v. California* and *Lockyer v. Andrade* from the United States Supreme Court must provide the basis for our analysis of whether defendant's sentence was disproportionate under the Eighth Amendment. Ewing was sentenced to a term of 25 years to life under the California "Three Strikes" law for stealing three golf clubs priced at $399 each, as petty theft with a prior conviction for theft. (*Ewing v. California, supra*, 538 U.S. at pp. 18, 20.) The Supreme Court applied the principles of gross disproportionality and deference to legislative policy choices to conclude that Ewing's sentence of 25 years to life "is not grossly disproportionate and therefore does not violate the Eighth Amendment's prohibition on cruel and unusual punishments." (*Id.* at pp. 30–31.)

Andrade was sentenced under California's Three Strikes law to two consecutive terms of 25 years to life on two counts of petty theft with prior theft-related convictions. (*Lockyer v. Andrade, supra*, 538 U.S. at p. 68.) On habeas corpus review, the United States Supreme Court rejected Andrade's claim that his sentence violated the prohibition against cruel and unusual punishment, holding "it was not an unreasonable application of our clearly established law for the California Court of Appeal to affirm Andrade's sentence of two consecutive terms of 25 years to life in prison." (*Id.* at p. 77.)

If terms of 25 years to life and 50 years to life are not " 'grossly disproportionate' " for petty theft with prior felony convictions, then defendant's total sentence of 50 years to life is not grossly disproportionate to the crime of murder, with a gang enhancement for the vicarious discharge of a firearm resulting in death.

DISPOSITION

The judgment is affirmed.

Bedsworth, Acting P. J., concurred.

**MOORE, J.,** Concurring and Dissenting.—I concur with my colleagues that there is substantial evidence to support defendant's murder conviction based on the felony-murder rule. But I think his sentence of two life sentences, running consecutively and totaling 50 years to life, is disproportionate and cannot withstand scrutiny under either the California Constitution or the United States Constitution.

At the time of the murder, defendant was 15. He was passively involved and immature. Two sentences of 25 years to life, running concurrently instead of consecutively, would withstand scrutiny. With such a sentence defendant would be stiffly punished, the public would be protected, corrections officials would be able to gauge any attempts defendant made to rehabilitate himself, and, should he earn parole, defendant would still have some opportunity at living a normal life. Society would be served if defendant had a glimmer of hope to motivate him to rehabilitate.

The probation report has some information about defendant, although it is difficult to glean exactly what the truth is since defendant, himself, is the source of much of the information in the report. He was born in July 1990. He never met his father. Concerned that he was at risk, his mother shipped him off to live with other family members in Victorville for two years, until he became homesick. Once home again, "he immediately began having 'racial problems' with the Hispanic community" and was offered protection by an Asian criminal street gang.

Defendant told the probation officer he resisted the gang's early attempts to recruit him, but when he was 14 he began associating with them. He said at one point he tried to disassociate himself, but they "jumped" him "for disrespecting the gang." In 2005, while he was still 14, he was arrested for possessing a dirk or dagger. At that time, he admitted he was a member of a criminal street gang and had the moniker of "Baby Lazy."

In 2006, he asked his mother if he could switch high schools to get away from the gang element, so his mother drove him to a high school in a different city on her way to work. But three days prior to their killing Miguel Davila, while shopping for shoes, defendant ran into his co-defendant, Thongdeng. By then he was 15 years old.

In discussing the situation, the probation officer noted: "He subsequently found himself torn between what was expected by his friends and what he knew would be in his best interest . . . ." On the night of the murder, defendant was at home under house arrest because of his previous crime, and had already refused to go out with one friend, when Thongdeng arrived at his house. He said he agreed to go out on the condition he would be back home in 30 minutes. According to defendant, a short time later, while at the carwash, when he realized Thongdeng had decided to rob Davila, he told him to "chill."

The probation officer summed up the situation: "The defendant was an active participant in gang activity and was vicariously armed at the time of this offense. He may have been a passive participant but he was nevertheless equally involved. Assuming the defendant is telling the truth and did not know in advance what they were going to do, he could have left upon realizing what the co-defendant was doing. Instead, by his own admission he followed after him and at the very least, stood by and watched. Later, as they were leaving he made eye contact with the victim who was crying out in pain and honking the horn in an effort to signal for help. [¶] The defendant has expressed regret in this matter but he has not conveyed true remorse. He presented himself as very frightened and is obviously immature. If it were not for the seriousness and gravity of the offense, it is felt the defendant would have been suitable for probation, but based on his convictions in this matter, he is neither eligible, nor suitable for a grant of probation. On behalf of the victim's family, as well as the future protection of the community, a lengthy state prison commitment is clearly warranted."

The Eighth Amendment to the United States Constitution declares: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The clause is "applicable to sentences for terms of years." (*Lockyer v. Andrade* (2003) 538 U.S. 63, 72 [155 L.Ed.2d 144, 123 S.Ct. 1166].)

Article I, section 17, of the California Constitution proscribes "[c]ruel or unusual punishment." A prison sentence runs afoul of article I, section 17, if it is "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424 [105 Cal.Rptr. 217, 503 P.2d 921], fn. omitted.)

"With respect to 'the nature of the offense,' we recognize that when it is viewed in the abstract robbery-murder presents a very high level of . . . danger, second only to deliberate and premeditated murder with malice aforethought. In conducting this inquiry, however, the courts are to consider

not only the offense in the abstract—i.e., as defined by the Legislature—but also 'the facts of the crime in question' [citation]—i.e., the totality of the circumstances surrounding the commission of the offense in the case at bar, including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts. [¶] Secondly, it is obvious that the courts must also view 'the nature of the offender' in the concrete rather than the abstract: although the Legislature can define the offense in general terms, each offender is necessarily an individual. . . . This branch of the inquiry therefore focuses on the particular person before the court, and asks whether the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*People v. Dillon* (1983) 34 Cal.3d 441, 479 [194 Cal.Rptr. 390, 668 P.2d 697].)

The significance of age has also been discussed by our United States Supreme Court in *Roper v. Simmons* (2005) 543 U.S. 551 [161 L.Ed.2d 1, 125 S.Ct. 1183]. "Three general differences between juveniles under 18 and adults demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders. First, . . . '[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions.' [Citations.] . . . [¶] The second area of difference is that juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure. [Citation.] . . . [¶] The third broad difference is that the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed. [Citation.] [¶] These differences render suspect any conclusion that a juvenile falls among the worst offenders. The susceptibility of juveniles to immature and irresponsible behavior means 'their irresponsible conduct is not as morally reprehensible as that of an adult.' [Citation.] . . . The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." (*Id.* at pp. 569–570.)

Age matters. Here defendant was 15. *Dillon* stressed that consequences also matter. And they certainly did in this situation. Had Mr. Davila not been murdered, defendant would have been eligible for probation.

"The exact scope of the constitutional phrase 'cruel and unusual' has not been detailed by this Court. But the basic policy reflected in these words is firmly established in the Anglo-American tradition of criminal justice. The

phrase in our Constitution was taken directly from the English Declaration of Rights of 1688, and the principle it represents can be traced back to the Magna Carta. The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards." (*Trop v. Dulles* (1958) 356 U.S. 86, 99–100 [2 L.Ed.2d 630, 78 S.Ct. 590], fns. omitted.)

A 50-year prison term should be reserved for our worst offenders. A 50-year-to-life term for an immature 15 year old with an underdeveloped sense of responsibility, who was an aider and abettor and not the shooter, and who had a relatively minor criminal record, is not within the limits of civilized standards. It is cruel and unusual punishment.

Appellant's petition for review by the Supreme Court was denied June 10, 2009, S171835. Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.