Filed 3/19/15  P. v. King CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>WALTER GERARD KING,<br><br>    Defendant and Appellant. | F067104<br><br>(Super. Ct. No. F11906258)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  John F. Vogt, Judge.

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Kevin L. Quade, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Walter Gerard King was charged with the murder of Felipe Atilano (Pen. Code,[1] § 187, subd. (a); count 1), the robbery of Atilano (§ 211; count 2), and the attempted robbery of Isidro Madera (§§ 211, 664; count 3). The information further alleged that (1) Atilano was killed while defendant was engaged in a robbery (§ 190.2, subd. (a)(17)(A)); (2) a principal personally and intentionally discharged a firearm, which proximately caused death or great bodily injury, in the commission of each offense (§ 12022.53, subds. (d) & (e)(1)); and (3) each offense was carried out for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)).

The jury convicted defendant of first degree felony murder (§ 189) on count 1 and the lesser included offense of attempted robbery on count 2 and acquitted him of attempted robbery on count 3. It found the firearm discharge allegation true and the felony-murder special circumstance untrue.[2] In a bifurcated proceeding, the trial court found the gang allegation true. Defendant was sentenced to 25 years to life, plus a consecutive 25 years to life for vicarious firearm discharge, on count 1. Execution of punishment on count 2 was stayed pursuant to section 654.

On appeal, defendant presents several contentions. First, the court erroneously admitted other-crimes evidence. Second, substantial evidence did not support the gang enhancement. Third, in contravention of *Miller v. Alabama* (2012) 567 U.S. ___ [132

---

[1] Unless otherwise indicated, subsequent statutory citations refer to the Penal Code.

[2] With regard to count 1, the trial court issued CALCRIM Nos. 540A (Felony Murder: First Degree—Defendant Allegedly Committed Fatal Act) and 540B (Felony Murder: First Degree—Coparticipant Allegedly Committed Fatal Act). It also issued CALCRIM Nos. 400 (Aiding and Abetting: General Principles) and 401 (Aiding and Abetting: Intended Crimes). With regard to the felony-murder special circumstance, the court issued CALCRIM Nos. 700 (Special Circumstances: Introduction), 703 (Special Circumstances: Intent Requirement for Accomplice After June 5, 1990—Felony Murder), and 730 (Special Circumstances: Murder in Commission of Felony). Given the findings on the matter, the jury necessarily concluded the People had not proven that defendant actually killed Atilano, intended to kill him, or acted with reckless indifference to human life.

2.

S.Ct. 2455] (*Miller*), the court did not consider age and other related factors before it imposed an aggregate sentence of 50 years to life. Fourth, the sentence was grossly disproportionate. Finally, the sentence violated equal protection.

We hold: (1) the court did not abuse its discretion when it admitted other-crimes evidence; (2) substantial evidence supported the gang enhancement; (3) *Miller* is inapplicable; (4) defendant's sentence was not grossly disproportionate; and (5) defendant's sentence did not violate equal protection.

## STATEMENT OF FACTS[3]

**I.     Prosecution case-in-chief**

On October 2, 2011, at approximately 6:00 a.m., police officers were dispatched to 2193 South Martin Luther King Junior Boulevard in Fresno, the location of an apartment complex known as "the Brownies." Upon their arrival, they spotted Atilano lying prone "in a pool of blood" next to his minivan. He was bleeding from his left ear and breathing laboriously. One of his pants pockets had been "turned inside out" and "there was some loose change around his body." Atilano was transported by paramedics to Community Regional Medical Center, where he died on October 8, 2011. The autopsy concluded that the cause of death was brain perforation inflicted by a bullet fired at least two feet away.

Crime scene investigators examined the interior of Atilano's van. They found blood stains on the driver side front seat and door panel; bullet holes in the passenger side front seat and door panel; a "clump of dark colored hair and possible body tissue" on the passenger side door panel; an open glove compartment; the vehicle owner's manual on the passenger side floorboard; and a bullet lodged in the passenger side floorboard. A latent fingerprint lifted from the manual belonged to Kylin Smith.[4] Police also received anonymous tips identifying Smith as one of two culprits.

---

[3]     Since defendant was acquitted of attempted robbery on count 3, we focus on the facts germane to his convictions on counts 1 and 2.

[4]     Smith is not a party to this appeal.

3.

Defendant and Smith were taken into custody on October 27, 2011.[5] At the outset, Detectives Andre Benson and Richard Tacadena questioned the men separately. During his individual interrogation, defendant related that he received a phone call from Smith at around 9:00 p.m. on October 1, 2011, and was asked to "go hit the lick," which meant "let's go find somebody to rob or something." The two convened at 2321 South Weller Avenue, where Smith's sister lived, and left on foot to "find somebody to rob, like, … beat somebody up or something." When they could not find anyone, Smith remarked, "[B]r[uh], let's go in somebody house." Defendant reluctantly accompanied Smith to the Brownies after Smith "call[ed] [him] a bitch." At approximately 11:00 p.m., Smith opened the window of an apartment unit. Defendant noticed a "Mexican" man sleeping on the floor and a gun tucked into Smith's waistband and "got kind of nervous" and "scared." After defendant and Smith argued momentarily, they elected not to enter the unit and explored the rest of the complex. Sometime between midnight and 1:00 a.m., they saw Atilano sleeping in an unlocked van and decided to rob him. Smith stated, "[B]r[uh], if this nigg[a] move wrong or anything br[uh], … we going to have to do this nigg[a]." Defendant intended to open the driver side door, but changed his mind because he did not want to leave any fingerprints. Smith opened the door instead and shot Atilano in the head. Defendant fled the scene. He denied searching Atilano's van and pants pockets.[6]

Benson, Tacadena, and Detective Conrado Martin then questioned defendant and Smith together. Smith, who had indicated during his individual interrogation that

---

[5] Defendant and Smith were originally arrested in connection with the incident underlying count 3. (See *ante*, fn. 4.)

[6] The jury listened to an audio recording of defendant's interrogation. In this opinion, for the sake of consistency, we employ (1) the phonetic spelling of the word "bruh" where the record uses "bra," "bre," and "bro" interchangeably; and (2) the phonetic spelling of the word "nigga" where the record uses "nigger." No disrespect is intended.

someone named "John Luke" shot Atilano, confessed that only he and defendant were involved in the incident. Smith spoke to defendant:

"[Smith]: You told the whole truth? The whole truth? On the 'H.' What you want me to do?

"[Defendant]: It's up to you, br[uh].

"[Smith]: You already know I don't rock like that ….

"[Defendant]: I'm not. You already know I don't rock like that either.

"[Smith]: But I know you a man and you take up for that. I know I'm a man too. It's your call Groove. I know you're younger than me. I know I call you my little nigga and everything but it's you[r] call br[uh]. [¶] … [¶]

"[Defendant]: I got shit else to say. It's over. I ain't got shit else to say.

"[Smith]: What you want me to do Groove?

"[Defendant]: I'm telling you Groove be smart about it. You said it, just be smart about it. [¶] … [¶]

"[Smith]: The truth …, you told them the truth?

"[Defendant]: Groove, 'H[,'] I ain't got shit else to say Groove.

"[Smith]: I'm asking br[uh], just answer this one question.

"[Defendant]: Yes, Groove, yes. Yes."

Smith denied shooting Atilano. Instead, he insinuated that defendant was the gunman:

"[Smith]: I ain't shoot [Atilano]. Point blank here, I didn't shoot him. Point blank here, I did not shoot that man.

"[Benson]: Who did?

"[Smith]: There was two people there, right?

"[Benson]: Yeah, there was—it was you and [defendant].

"[Smith]: Right.

"[Benson]: So [defendant] did it?

"[Smith]: That's the only other person that was there."

5.

Thereafter, defendant and Smith bickered:

>"[Smith]:  A real G gonna take up for th[eir] dog do that shit, man.  Real talk our mamas do that shit br[uh] you know the old saying dog.  If you do it then you can do it.  You know the old saying Groove.  Don't play with me.

>"[Defendant]:  Don't play me.

>"[Smith]:  I'm not.  You already just tried to play me dog.  On the funny side you did but on some scandalous shit you did 'cause what I'm getting is that they telling me that you said I did that shit Groove.

>"[Benson]:  Ain't … no code now.  [Defendant] told us you did it.  It shows there's only two [of] you … guys out there and that you did it.

>"[Smith]:  I did that shit …?

>"[Defendant]:  Real talk.  Tell him nigga what happened.

>"[Smith]:  You tell them what happened, nigga.  And tell them the truth.

>"[Defendant]:  I said it.

>"[Smith]:  Don't sugar coat shit.  Tell them the truth.

>"[Defendant]:  It's not even about that, br[uh].

>"[Smith]:  Well what's it about …?

>"[Defendant]:  It's about the truth, nigga.  [¶] … [¶]  … I already said what I have to say br[uh], you did it.

>"[Benson]:  What happened [Smith]?  [Defendant]'s not lying.

>"[Smith]:  [Defendant] is lying.  [¶] … [¶]  … [Defendant] shot that nigga on Hoover.  I don't give a fuck nigg[a].  It's scandalous game br[uh] a mother fucker don't give a fuck what you call it br[uh] you try to play me on the funny side know I ain't do that shit br[uh] on Hoover br[uh] you scandalous than a mother fucker.  I don't rock like that br[uh]."

Smith conceded that he opened the van door, "tapped" and "patted" Atilano's pants pockets, and combed the van, including the glove compartment, but maintained that

defendant shot Atilano, dragged him out of the van, and also searched the pockets and vehicle.[7]

At trial, Detective Ron Flowers, an expert on African-American criminal street gangs, testified that the 107 Hoover Crips (Hoovers) claim an area in southwest Fresno bounded by California Avenue, B Street, Geneva Avenue, Lorena Avenue, and Martin Luther King Junior Boulevard. The Brownies are located within this "sphere of influence." The Hoovers primarily engage in shootings, robberies, burglaries, and assaults and often commit these crimes in their own territory. They identify with the colors blue, green, and orange, the five-point star, and the letter "H." The phrases "on Hoover" and "on H" "demonstrate[] [Hoovers'] commitment, alliance and trust by placing everything that they hold to be true on th[e] gang." Rivals include the Weller Boys and the Murder Squad, an alliance comprised of the Modoc Boys, U-Boys, and Garrett Street.

Flowers opined that defendant was a Hoover at the time of the shooting. Police reports from June 14, 2006, to October 29, 2011, confirmed that he wore blue and orange apparel, had tattoos of stars, the letter "H," and the word "Hoova," associated with known Hoovers, and was involved in skirmishes with the Weller Boys. Furthermore, defendant disclosed in a June 1, 2012, jail classification form that he was a Hoover and anticipated problems with inmates who associated with the Murder Squad.[8]

When asked whether Atilano's murder and robbery benefitted the Hoovers, Flowers answered:

> "I think the benefit from the act … is the status, the elevation, the recognition from the community …. Their propensity towards violence is recognized and people will do their best to avoid that group, avoid certain areas[;] therefore, the gang flourishes. They maintain control of that

---

[7]   The jury watched a video recording of defendant and Smith's joint interrogation.

[8]   In addition, Flowers concluded that Smith was a Hoover based on similar indicia.

7.

specific area and they could essentially commit crimes with impunity. [¶] … [¶]

> "… [W]ithin the confines of that particular community[,] people are aware of certain members, certain school-aged kids who are often contacted by police who have a reputation. They become aware. And when they hear about these incidents they see the crime scene, the next door neighbors' streets are taped off, unable to travel, all of that collectively adds to the gang's reputation and in my opinion elevates their status within that community and abroad…. [¶] … [¶] … From my perspective, my previous assignment in that area, the way [Atilano] was found, I think I would have dr[a]w[n] … inferences that it was a robbery and that it was probably gang related because of the controlling factions within that small community."

Flowers added that the standing of the gang member who committed the crimes would be enhanced:

> "[A] robbery or a lick … could reward a person with great sums of money, but the act itself, the willingness to go out and commit those types of offenses, especially with your gang as an audience generally rewards that person with prestige and rank amongst the gang, the group, identity, and reputation."

Regarding the significance of two gang members committing a crime together, Flowers stated:

> "[W]hen you commit a crime with other members of your gang or a group[,] it makes committing those crimes easier…. [Y]ou might have a person assigned as a lookout, … another person maybe holding a gun for defense or offensive purposes. It's the same formula. All inhibitions are set aside when you're in a group setting."

## II.     Defense case-in-chief

On October 1, 2011, between 9:00 p.m. and 10:00 p.m., defendant, then 17 years old, received a phone call from Smith and was asked to "go do a lick," which meant "various things" such as "break[ing] into someone's home," "snatch[ing] a wallet," and "snatching things from people by force." They met up at Smith's sister's residence, smoked marijuana, left on foot "to find something to steal," and ended up at the Brownies. Defendant looked inside one of the apartment units and spotted an Hispanic man sleeping on the floor. As Smith was opening the window of the unit, defendant saw

a pistol tucked into Smith's waistband and asked, "What are you gonna do with that?" Smith did not respond. Defendant then indicated that he "didn't want to go in" because "a person [was] present." After the pair argued for about three minutes, they decided "[t]o walk around the [Brownies] to find another window open to another residence." In the parking lot, defendant and Smith came across a van. Smith approached the vehicle, noticed Atilano sleeping, tapped on the window, and said, "We own this nigg[a]." Defendant replied, "I don't have anything to do with this." As he was leaving the scene, he heard Smith opening the door and firing a gunshot. Defendant ran home. The following day, he was informed by a female acquaintance that "a shooting had t[a]k[en] place in [the Brownies]" and "everybody's been talking about it." Defendant did not contact police because he was scared and "didn't want to be a snitch."

Defendant acknowledged that he became a Hoover at age 12 or 13, but insisted that he "no longer participate[d] in that group" after "[t]he first time [he] ever got shot at in [his] life." He still maintained relationships with friends and relatives who associated with the Hoovers and other gangs. Defendant opted to "do a lick" with Smith solely for the money. He knew that Smith associated with a gang, but did not know which one.

## DISCUSSION

I. **The trial court did not abuse its discretion when it admitted other-crimes evidence**

a. *Background*

During the October 27, 2011, interrogation, defendant was questioned about his involvement in other robberies:

"[Martin]: … How many robberies have you guys done over there?

"[Defendant]: How many robberies have we done over there?

"[Martin]: Yeah. How many Mexicans have you all beat up and got some money?

"[Defendant]: Me, personally?

"[Martin]: Yeah.

9.

"[Defendant]:  Me personally, I did a couple.  I say I did like two, maybe three.  Well, physical—physical, two maybe.

"[Martin]:  Did you get any money?

"[Defendant]:  Yeah, I got some money before.  [¶] … [¶]

"[Martin]:  …  How many different robberies have you guys d[one] as a group?

"[Defendant]:  Not that many.

"[Martin]:  Okay.

"[Defendant]:  (UNINTELLIGIBLE)

"[Martin]:  More than one, right?

"[Defendant]:  Two or three.  [¶] … [¶]

"[Martin]:  Who's normally doing it?  [¶]  … You, [Smith], who?

"[Defendant]:  It was—it was normally—it would be me…."

Before trial, defense counsel moved to redact defendant's statements.  The prosecutor argued that other-crimes evidence was relevant to show defendant's intent.  Defense counsel countered that the charged and uncharged crimes lacked sufficient similarity.  The court denied the request:

> "Well, we have, 'How many Mexicans have you beat up and got some money?'  How much more similar do we need?  I guess he could have said, 'Older Mexicans sitting in cars passed out ….'  [¶]  Look, the way I'm looking at this … issue here is [not] to strike … the references to other crimes.  That's the way I'm looking at it, that the references to other crimes would come in under [Evidence Code section] 1101[, subdivision ](b) …."

At trial, the jury watched a video recording of the interrogation.  Prior to jury deliberations, the court issued CALCRIM No. 375 (Evidence of Uncharged Offense to Prove Identity, Intent, Common Plan, etc.):

> "Now, the People presented evidence that the defendant committed other offenses of robbery that were not charged in this case.  You may consider this evidence only if the People have proved by a preponderance

of the evidence that the defendant in fact committed these uncharged offenses.  [¶] … [¶]

"If you decide that the defendant committed the uncharged offenses, you may, but are not required to, consider that evidence for the limited purposes of deciding whether or not the defendant was the person who committed the offenses alleged in this case or the defendant acted with the mental state or specific intent [required] to prove the offenses as alleged in this case or the defendant had a plan to commit the offenses as alleged in this case.[9]

"In evaluating this evidence, consider the similarity or lack thereof between the uncharged offenses and the charged offenses.  Do not consider this evidence for any other purpose except for the limited purpose of determining the defendant's credibility.

"If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all of the other evidence in the case.  It is not sufficient by itself to prove that the defendant is guilty of any of the charged crimes or allegations.  The People must still prove each charge and allegation beyond a reasonable doubt."[10]

b.  *Standard of review*

Rulings made under Evidence Code sections 352 and 1101 are reviewed for an abuse of discretion.  (*Foster*, *supra*, 50 Cal.4th at p. 1328; *People v. Mungia* (2008) 44 Cal.4th 1101, 1130.)  "Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'  [Citation.]"  (*People v. Hovarter* (2008) 44 Cal.4th

---

**9**    Although defendant discusses the prior crime evidence as it relates to identity, common design or plan, and intent, he identifies intent as "the critical issue"; conceding his presence at the scenes of the crimes to the detectives.  (*People v. Foster* (2010) 50 Cal.4th 1301, 1333 (*Foster*) [whether sufficiently similar to prove identity of no import if evidence is admissible for other reasons; relevant too is the fact there was "overwhelming evidence establishing … defendant was, in fact, the perpetrator of the charged crimes"].)

**10**    The court also issued CALCRIM No. 303 (Limited Purpose Evidence in General):

"Now, during the trial certain evidence was admitted for a limited purpose and you may consider that evidence only for that purpose and for no other."

11.

983, 1004; see *People v. Kipp* (1998) 18 Cal.4th 349, 371 (*Kipp*) ["A court abuses its discretion when its ruling 'falls outside the bounds of reason.'"].)

    c. *Analysis*

"Evidence that a defendant has committed crimes other than those currently charged is not admissible to prove that the defendant is a person of bad character or has a criminal disposition; but evidence of uncharged crimes is admissible to prove, among other things, … the intent with which the perpetrator acted in the commission of the charged crimes." (*Kipp*, *supra*, 18 Cal.4th at p. 369, citing Evid. Code, § 1101.) Other-crimes evidence is admissible to prove intent "only if the charged and uncharged crimes are sufficiently similar to support a rational inference of … intent." (*Kipp*, *supra*, at p. 369.) "The least degree of similarity is required to establish relevance on the issue of intent. [Citation.] For this purpose, the uncharged crimes need only be 'sufficiently similar [to the charged offenses] to support the inference that the defendant "'probably harbor[ed] the same intent in each instance.' [Citations.]"' [Citation.]" (*Id.* at p. 371; see *People v. Demetrulias* (2006) 39 Cal.4th 1, 15 ["The incidents need not have the greater degree of similarity required to show the existence of a common plan or the shared distinctive pattern required to show identity."]; cf. *Kipp*, *supra*, at p. 370 ["Evidence of an uncharged crime is relevant to prove identity only if the charged and uncharged offenses display a '"pattern and characteristics … so unusual and distinctive as to be like a signature."'"]; *id.* at p. 371 ["A lesser degree of similarity is required to establish relevance on the issue of common design or plan. [Citation.] For this purpose, 'the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual.'"].)[11]

---

[11]     If other-crimes evidence is admissible to prove intent, then the question of whether this evidence is also admissible to prove a common plan and/or identity is rendered moot. (See *People v. Yeoman* (2003) 31 Cal.4th 93, 122 (*Yeoman*).)

"If evidence of prior conduct is sufficiently similar to the charged crimes to be relevant to prove the defendant's intent, … the trial court then must consider whether the probative value of the evidence 'is "substantially outweighed by the probability that its admission [would] … create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." [Citation.]' [Citation.]" (*Foster*, *supra*, 50 Cal.4th at p. 1328; accord, Evid. Code, § 352.) "'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.'" (*People v. Karis* (1988) 46 Cal.3d 612, 638.) "'In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' [Citation.]" (*People v. Doolin* (2009) 45 Cal.4th 390, 439.)

We conclude the court did not abuse its discretion when it admitted other-crimes evidence. During defendant's interrogation, Martin asked, "How many Mexicans have you all beat up and got some money? [¶] … [¶] … How many different robberies have you guys d[one] as a group?" Defendant indicated that he "physical[ly]" participated in two or three such robberies with at least one other companion. Likewise, in the instant case, he was charged as a principal—either one of two direct perpetrators or an aider and abettor—in the robbery of an Hispanic male. The charged and uncharged offenses were sufficiently similar to support the inference that defendant probably harbored either the intent to rob Atilano (see *People v. Burney* (2009) 47 Cal.4th 203, 253 [robbery and felony murder based on robbery require specific intent to permanently deprive a victim of his or her property]; see also *People v. Lindberg* (2008) 45 Cal.4th 1, 24 [attempted robbery requires specific intent to commit robbery]), the intent to commit, facilitate, or

encourage commission of the robbery (see *People v. Cooper* (1991) 53 Cal.3d 1158, 1164), or both (see *People v. Calhoun* (2007) 40 Cal.4th 398, 402 ["'When two or more persons commit a crime together, both may act in part as the actual perpetrator *and* in part as the aider and abettor of the other, who also acts in part as an actual perpetrator.'"]).**12**

---

**12** Defendant cites *Foster*, *supra*, 50 Cal.4th 1301, and *Yeoman*, *supra*, 31 Cal.4th 93, for the proposition that charged and uncharged crimes must have "far greater similarity" than in defendant's case before an inference of intent is supported. We disagree.

In *Foster*, the defendant was convicted of first degree felony murder, second degree burglary, and second degree robbery. (*Foster*, *supra*, 50 Cal.4th at pp. 1307, 1349.) At trial, the prosecution introduced evidence of two uncharged robberies. (*Id.* at pp. 1326-1327.) The charged and uncharged crimes shared the following features: the defendant "visit[ed] an office in the middle of the day, determin[ed] that a woman was alone in the office, return[ed] in the middle of the day, mov[ed] the woman to a more remote area of the premises, demand[ed] the woman's money and any other cash available on the premises, and violently attack[ed] her when she resisted." (*Id.* at p. 1329; see *id.* at pp. 1326-1327.) The trial court accepted the other-crimes evidence as sufficiently similar to prove both common plan and intent (*id.* at p. 1327) and the California Supreme Court upheld the ruling on automatic appeal (*id.* at pp. 1329-1332).

To be admissible on the issue of intent, the other-crimes evidence need not have the greater degree of similarity required to show the existence of a common plan. (*People v. Demetrulias*, *supra*, 39 Cal.4th at p. 15.) Other-crimes evidence admissible to prove common plan, therefore, is necessarily admissible to prove intent. Assuming, without deciding, the degree of similarity in *Foster* exceeded the degree of similarity in defendant's case, that does not lead to the conclusion the other-crimes evidence was not admissible to prove intent.

In *Yeoman*, the defendant was convicted of first degree felony murder, robbery, and false imprisonment. (*Yeoman*, *supra*, 31 Cal.4th at p. 104.) Evidence at trial showed that the defendant stopped to help the female victim whose car broke down on the freeway, attempted but failed to fix her vehicle, offered her a ride in his truck, and shot and killed her sometime after she entered the truck. (*Id.* at p. 105.) The prosecution then introduced evidence of a previous robbery and kidnapping attempt. In that instance, a female motorist experienced a flat tire in a parking lot. The defendant offered to help and repaired the tire. Afterward, he brandished a gun and a knife, threatened the motorist, and ordered her to go inside his truck. While she escaped, the defendant grabbed her purse from the inside of her car and fled the scene. (*Id.* at p. 107.) The trial court admitted the other-crimes evidence as sufficiently similar to prove intent. (*Ibid.*) On automatic appeal, the California Supreme Court upheld the ruling. (*Id.* at p. 121.) In

14.

Furthermore, admission of other-crimes evidence did not create a substantial danger of undue prejudice. Defendant's statements were neither extensive nor time consuming. Their contents were not uniquely inflammatory. The charged offenses, in fact, were more likely to have aroused the passion of the jurors against him. The court also issued CALCRIM No. 375, which delineates the purpose of other-crimes evidence.[13] (See *People v. Frazier* (2001) 89 Cal.App.4th 30, 42 [risk of jury punishing a defendant for an uncharged crime counterbalanced by appropriate instructions]; see also *People v. Holt* (1997) 15 Cal.4th 619, 662 ["Jurors are presumed to understand and follow the court's instructions."].) That the jurors convicted defendant on counts 1 and 2 and acquitted him on count 3 affirmatively demonstrated that they carefully examined all the evidence and reached a reasonable verdict.[14]

---

particular, it rejected the defendant's argument that the charged and uncharged crimes needed to share "[]sufficient common features to be probative of intent" (*ibid.*) and reiterated the rule that these crimes "need only be sufficiently similar to support the inference that defendant probably harbored the same intent in each instance" (*ibid.*). Nevertheless, defendant's "'good Samaritan ploy'" in both cases supported such an inference. (*Id.* at p. 122.)

The question here is not whether the degree of similarity equates to the points of similarity in *Yeoman*. The question is whether the uncharged offenses here were sufficiently similar to support the inference the defendant "'"'probably harbor[ed] the same intent in each instance.'"'" (*Foster*, *supra*, 50 Cal.4th at p. 1328.)

[13] Defendant points out that the court's rendition of CALCRIM No. 375 did not include the following line: "'Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime.'" Notwithstanding this omission, the instruction as given recited that other-crimes evidence "may … [be] consider[ed] … for the limited purposes of deciding whether or not the defendant … acted with the mental state or specific intent [required] to prove the offenses as alleged in this case," but "is not sufficient by itself to prove that the defendant is guilty of any of the charged crimes or allegations." (*Ante*, at pp. 11, 12.)

[14] Because we find no error, we need not address defendant's claim of prejudicial error.

## II. Substantial evidence supported the gang enhancement

### a. *Standard of review*

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60 (*Albillar*).) "We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence." (*Id.* at p. 60.) "Before the judgment of the trial court can be set aside for insufficiency of the evidence to support the verdict of the jury, it must clearly appear that upon no hypothesis what[so]ever is there sufficient substantial evidence to support it." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Albillar*, *supra*, at p. 60.)

"Although we must ensure the evidence is reasonable, credible, and of solid value, … it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." (*Ibid.*)

### b. *Analysis*

"[A]ny person who is convicted of a felony committed for the benefit of, at the direction of, *or* in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished …." (§ 186.22, subd. (b)(1), italics added.) "Thus, the trial court can impose the enhancement

16.

only if the prosecution establishes both of the following elements beyond a reasonable doubt:  first, that the defendant committed a felony (a) for the benefit of, (b) at the direction of, or (c) in association with a criminal street gang; and second, that in connection with the felony, the defendant harbored the specific intent to (a) promote, (b) further, or (c) assist in any criminal conduct by gang members."  (*In re Daniel C.* (2011) 195 Cal.App.4th 1350, 1358, italics omitted.)

We conclude that substantial evidence supported the gang enhancement.  The record—viewed in the light most favorable to the verdict—shows that (1) defendant and Smith were Hoovers at the time of the shooting;[15]  (2) defendant and Smith teamed up for the express purpose of robbing someone; (3) defendant and Smith entered the Brownies and encountered Atilano; (4) defendant and Smith intended to rob Atilano, notwithstanding defendant's trepidation concerning Smith's gun possession; and (5) Smith shot Atilano in the course of the attempted robbery.  Flowers, a gang expert, testified that (1) the Hoovers primarily engage in shootings and robberies; (2) the Hoovers often commit these crimes inside their own territory; (3) the Brownies are located within the gang's "sphere of influence"; (4) gang members commit crimes together because the additional personnel fosters misbehavior, allows for distribution of labor, and increases the likelihood of success; and (5) an individual gang member gains prestige if he commits crimes in the presence of a gang "audience."[16]  A reasonable trier of fact could deduce from this evidence that defendant and Smith "came together as gang members" (*Abillar*, *supra*, 51 Cal.4th at p. 62, italics omitted; see *People v. Martinez*

---

[15]     Defendant does not dispute his and Smith's gang memberships on appeal.

[16]     "Gang evidence, including expert testimony, is relevant and admissible to prove the elements of the substantive gang crime and gang enhancements."  (*People v. Williams* (2009) 170 Cal.App.4th 587, 609.)  "Expert testimony is admissible to establish the existence, composition, culture, habits, and activities of street gangs; a defendant's membership in a gang; gang rivalries; the 'motivation for a particular crime, generally retaliation or intimidation'; and 'whether and how a crime was committed to benefit or promote a gang.'  [Citation.]"  (*People v. Hill* (2011) 191 Cal.App.4th 1104, 1120.)

17.

(2008) 158 Cal.App.4th 1324, 1332; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 [association may be inferred from the fact that the defendant committed the crime with a fellow gang member]) and "relied on their common gang membership and the apparatus of the gang" (*Albillar*, *supra*, at p. 60) when they attempted to rob Atilano. Moreover, "[c]ommission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime." (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 322; accord, *Albillar*, *supra*, at p. 68; *People v. Miranda* (2011) 192 Cal.App.4th 398, 412; see *People v. Manibusan* (2013) 58 Cal.4th 40, 87 ["'[E]vidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence ….'"]; *People v. Margarejo* (2008) 162 Cal.App.4th 102, 110 ["We cannot look into people's minds directly to see their purposes. We can discover mental state only from how people act and what they say."].)[17]

### III. *Miller* is inapplicable to the instant case

The Eighth Amendment to the United States Constitution, which is applicable to the states via the due process clause of the Fourteenth Amendment (*Robinson v. California* (1962) 370 U.S. 660, 675 (conc. opn. of Douglas, J.); accord, *Graham v. Florida* (2010) 560 U.S. 48, 53 (*Graham*)), outlaws the imposition of "cruel and unusual punishments."[18] This prohibition "guarantees individuals the right not to be subjected to

---

[17]    Because we find that the felony murder and attempted robbery were committed "in association with any criminal street gang," we need not address whether these felonies were also committed "for the benefit of" or "at the direction of" the gang. (See *People v. Morales*, *supra*, 112 Cal.App.4th at p. 1198.)

[18]    On the other hand, article I, section 17 of the California Constitution provides that "[c]ruel or unusual punishment may not be inflicted or excessive fines imposed." This clause "goes beyond punishment that is 'cruel *and* unusual' under the Eighth Amendment to punishment that is 'cruel *or* unusual.' The state constitutional provision is broader than its federal constitutional counterpart. [Citation.] Hence, it necessarily extends at

excessive sanctions" (*Roper v. Simmons* (2005) 543 U.S. 551, 560), a right which "flows from the basic '"precept of justice that punishment for crime should be graduated and proportioned to [the] offense"'" (*ibid.*). The concept of proportionality is "central to the Eighth Amendment" (*Graham*, *supra*, at p. 59) and "view[ed] … less through a historical prism than according to '"the evolving standards of decency that mark the progress of a maturing society"'" (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2463]). "This is because '[t]he standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment. The standard itself remains the same, but its applicability must change as the basic mores of society change.' [Citation.]" (*Kennedy v. Louisiana* (2008) 554 U.S. 407, 419.)

The United States Supreme Court "has adopted categorical bans on sentencing practices based on mismatches between the culpability of a class of offenders and the severity of a penalty" (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2463]), including (1) the juvenile death penalty (*Roper v. Simmons*, *supra*, 543 U.S. at pp. 568, 572-574); and (2) life without possibility of parole (LWOP) for juveniles who commit nonhomicide offenses (*Graham*, *supra*, 560 U.S. at pp. 74-79). The California Supreme Court extended "*Graham*'s 'flat ban' on [LWOP] … to all nonhomicide cases involving juvenile offenders, including the term-of-years sentence that amounts to the functional equivalent of [LWOP]" (*People v. Caballero* (2012) 55 Cal.4th 262, 268 (*Caballero*)), concluding that "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside of the juvenile offender's natural life expectancy [e.g., 110 years to life] constitutes cruel and unusual punishment in violation of the Eighth Amendment" (*ibid.*).

The United States Supreme Court has not categorically barred LWOP for juveniles who are convicted of homicide (*Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2471]),

least as far in its protection." (*People v. Smithey* (1999) 20 Cal.4th 936, 1019-1020, fn. 1.)

19.

but nonetheless found unconstitutional "a sentencing scheme that mandates [LWOP] for [these] offenders" (*id.* at pp. \_\_\_, \_\_\_ [132 S.Ct. at pp. 2469, 2475]). The high court's holding in *Miller* does not prohibit a sentencing court from distinguishing between "'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption'" (*id.* at p. \_\_\_ [132 S.Ct. at p. 2469), but "requires [the sentencer] to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison" (*ibid.*). The California Supreme Court detailed that these *Miller* factors must include (1) the juvenile offender's age at the time of the crime and age-related characteristics (e.g., immaturity, impetuosity, failure to appreciate risks and consequences); (2) evidence of environmental vulnerabilities (e.g., childhood abuse or neglect, familial drug or alcohol abuse, lack of adequate parenting or education, prior exposure to violence, susceptibility to psychological damage or emotional disturbance); (3) the circumstances of the homicide offense (e.g., the extent of the juvenile offender's participation in the crime, effect of familial and peer pressures, whether substance abuse played a role in juvenile offender's commission of crime); (4) evidence demonstrating that the juvenile offender could have been charged and convicted of a lesser offense but for the incompetencies associated with youth (e.g., inability to deal with law enforcement officials, incapacity to assist own attorney); and (5) evidence bearing on the possibility of rehabilitation (e.g., extent or absence of past criminal history). (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1388-1389, citing *Miller*, *supra*, 567 U.S. at pp. \_\_\_, \_\_\_-\_\_\_ [132 S.Ct. at pp. 2465, 2467-2469]; see *People v. Gutierrez*, *supra*, at p. 1390 ["To be sure, not every factor will necessarily be relevant in every case."].) In view of *Graham*, *Miller*, and *Caballero*, the First, Second, and Fourth Appellate Districts have ruled that a sentencing court must adhere to *Miller*'s multifactorial inquiry before it can impose a term-of-years sentence tantamount to LWOP on a juvenile homicide offender. (*People v. Lewis* (2013) 222 Cal.App.4th 108, 118-123 [115 years to life]; *People v. Thomas* (2012)

211 Cal.App.4th 987, 1013-1016 [196 years to life]; *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1480-1482 [100 years to life].)

Defendant argues he was 17 years old at the time of the murder. He asserts that statistics from the U.S. Census Bureau and from a 2010 analysis by the Centers for Disease Control and Prevention place his life expectancy at "no greater than approximately" age 72.[19] He asserts that a sentence of 50 years to life means he will not be considered for parole until he is 67 years old. He concedes that his sentence is "not an LWOP sentence or a technical equivalent based on average life expectancy tables," but argues release at age 67 does not provide him with a "meaningful opportunity" to obtain release. He states the trial court should resentence him to 25 years to life by striking the firearm enhancement.

The People argue defendant's life expectancy, based on U.S. Census Bureau information is between 76.3 and 76.5 years. They point out that new legislation enacted by Senate Bill 260 affords defendant a parole hearing in 25 years, not 50 years. (§ 3051, subd. (b)(3).) They assert, though, that even if defendant's first parole hearing is in 50 years, and even if his life expectancy is as he asserts, his parole eligibility "falls outside his natural life expectancy" therefore affording him the "meaningful opportunity at release within his expected lifetime" as required by *Caballero*.

*Miller* does not apply to the instant case. The court imposed neither an actual nor a de facto LWOP sentence. Defendant's aggregate 50-years-to-life sentence affords a

---

**19**    "We note that the term 'life expectancy' means the normal life expectancy of a healthy person of defendant's age and gender living in the United States." (*Caballero*, *supra*, 55 Cal.4th at p. 267, fn. 3.) At sentencing, the prosecutor asserted that defendant had a life expectancy of 76 years, according to the Social Security Administration's 2007 period life table. On appeal, we granted defendant's motion to judicially notice several life tables presented in the United States Census Bureau's Statistical Abstract of the United States: 2012. (See <http:www.census.gov/compendia/statab/2012edition.html> [as of Mar. 19, 2015].) Table 104 specifies that the normal life expectancy of a male born in 1994—defendant's birth year—is 72.4 years.

parole eligibility date that falls within his natural life expectancy—i.e., defendant will be eligible for parole at age 67. (See *Caballero*, *supra*, 55 Cal.4th at p. 268 ["[A] state must provide a juvenile offender 'with some realistic opportunity to obtain release' from prison during his or her expected lifetime."]; but see *People v. Perez* (2013) 214 Cal.App.4th 49, 52 [juvenile offender's sentence must "leave the possibility of a substantial life expectancy after prison"].) Defendant concedes this point on appeal. The sentencing court was under no obligation to comply with *Miller*.[20]

## IV. Defendant's aggregate 50-years-to-life sentence was not grossly disproportionate

### a. *Background*

In a memorandum dated April 15, 2013, defense counsel requested a sentence reduction:

> "On behalf of [defendant], we are asking that the court impose only a sentence of 25 years to life. [Defendant] was 17 years old when this offense was committed. By receiving a sentence of 25 years to life, he could spend the rest of his life in prison. However, at some point, if his conduct in prison is satisfactory and positive, at least now there is a chance for his parole after a significant amount of time.

> "The defense respectfully submits that it is a violation of both the Federal and California Constitutions['] … prohibition against '*cruel and unusual punishment*' for [defendant] to receive 2 consecutive 25[-]to[-]life sentences. Moreover, although typically *[section] 12022.53* … requires the *personal possession and use of a firearm in order for that enhancement to qualify, the only exception is under [section] 12022.53[, subdivisions ](d)[ and ](e)(1), when the principal is personally armed and there is a violation of [s]ection 186.22[, subdivision ](b)—commonly referred to as the gang crime enhancement*.

> "It would seem to the defense that it is particularly onerous for [defendant] to receive 25 years to life for a *murder* that he did not commit because he

---

[20] Defendant cites *State v. Null* (Iowa 2013) 836 N.W.2d 41, 71-72, for the proposition that *Miller* applies to a "lengthy" term-of-years sentence. We are not bound by decisions of other states' courts. (See, e.g., *Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 243; *People ex rel. Morgan v. Hayne* (1890) 83 Cal. 111, 119.)

falls within the strict guidelines of the Felony-Murder Rule; and also be punished an additional 25 years to life because an *accomplice was personally armed*, and once again [defendant] was not armed, but may have some liability under this enhancement because of a fairly weak gang enhancement.

"In any event, for all the reasons listed above, the defense request that the court exercise its discretion and only impose one 25-year[s-]to[-]life sentence in this matter…."

At the April 18, 2013, sentencing hearing, defense counsel asked the court to stay the 25-years-to-life firearm discharge enhancement in order to give defendant an earlier opportunity to apply for parole, pointing out that defendant (1) was 17 years old at the time of the shooting; (2) accepted responsibility for his role in the incident; (3) did not actually shoot Atilano; (4) did not personally discharge the gun; and (5) expressed remorse. The prosecutor argued that defendant (1) minimized his conduct; (2) intended to commit robbery; (3) was aware that Smith possessed a firearm; and (4) was a gang member. The prosecutor also asserted that the court did not have any discretion to reduce the sentence.[21]

The court denied defense counsel's request:

"I know that we had discussed at various times in our trial proceedings the fact that there were uncertainties that were being resolved by Courts of Appeal and higher courts with regard to life sentences being imposed on juveniles under various circumstances and configurations of sentence and, quite frankly, I entered this hearing today with the basic idea that there is uncertainty attached thereto. But what I did understand is essentially the findings of the jury on the first-degree murder and the enhancement under [section] 12022.53[, subdivision ](d) pretty much lay the direction of what needs to be done here. [¶] … [¶]

---

**21**      Although such a sentence is normally nondiscretionary (see §§ 190, subd. (a), 12022.53, subds. (d), (e)(1), (h), & (j)), "a mandatory punishment provided by law may [nonetheless] contravene constitutional principles and a court has the authority to intervene under such circumstances to prevent an unconstitutional punishment from being imposed" (*People v. Felix* (2003) 108 Cal.App.4th 994, 999, citing *People v. Dillon* (1983) 34 Cal.3d 441, 478).

23.

"You know, as I thought about this whole thing looking at it again over the last several days and the [probation officer's report] in front of me I will tell you that, quite frankly, I feel that the gang issues are inextricably involved in this case, but for [defendant]'s involvement with Mr. Smith and other gang members that this whole thing never would have occurred. But I also looked at what happened in the initial taped interviews of [defendant] and the detectives, particularly the interview where he and Mr. Smith are together and I think I came away from those interviews with a feeling that [defendant] was trying to be a stand-up guy, that he was trying to accept responsibility for what he knew in the terrible and tragic wrong.

"By the time he got to the stand I, quite frankly, thought he tried to minimize his conduct and, you know, I did not take part in any of your discussions with the jury. I don't know how they specifically looked at it, but that was the distinct feeling that I derived from this, and when I reviewed the report and recommendation here and looked at the defendant's statement, … I kind of felt and was torn in my assessment of the ultimate sentencing factors here because on one hand he's resigned to accept responsibility, meaning accept the prison commitment that he knows is coming and he's sorry that someone is dead, but I still think that what he's trying to do is minimize his conduct. It troubles me because what happened here is undeniable. His involvement here, whether it's as an aider and abettor or the actual shooter brings us to the same legal crossroads.

"I also was pretty much unaware of the nature and extent of his entire juvenile history when we were going through this trial. I realize that he has had a more troubled past than I, quite frankly, understood or appreciated along the way. And the thing that impressed me about this history is essentially he is … someone given to criminal conduct, particularly robbery, and what I would call intimidation kind of tactic[s].

"We've got some rather aggravated circumstances in a jewelry store case, an auto burglary that turned bad. We have a [section] 69 [i.e., obstructing or resisting a police officer]. We have behavior dating back to 2007 where there were gang restrictions, anger management issues addressed. When we go through the history there are more gang issues. And, you know, I do understand the proposed circumstance in mitigation …. I did have that in mind as we went along but, again, I looked at it a little further in light of the things that I heard and saw during the trial. I'm not sure it constitutes a circumstance in mitigation per se, but it is something that needs to be acknowledged. But the circumstances in aggravation clearly outweigh any circumstances in mitigation."

Defendant was sentenced to 25 years to life, plus a consecutive 25 years to life for vicarious firearm discharge, on count 1. Execution of punishment on count 2 was stayed pursuant to section 654.

b. *Standard of review*

"Whether a punishment is cruel and/or unusual is a question of law subject to our independent review, but underlying disputed facts must be viewed in the light most favorable to the judgment." (*People v. Palafox* (2014) 231 Cal.App.4th 68, 82.)

c. *Analysis*

Both the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution prohibit cruel and unusual punishment. (*People v. Em* (2009) 171 Cal.App.4th 964, 972, 976-977 (*Em*); see *ante*, fn. 18.) Punishment is cruel and unusual if it is "'grossly disproportionate.'" (*People v. Mendez* (2010) 188 Cal.App.4th 47, 64; see *Graham*, *supra*, 560 U.S. at pp. 59-60 ["[T]he Eighth Amendment contains a 'narrow proportionality principle,' that 'does not require strict proportionality between crime and sentence' but rather 'forbids only extreme sentences that are "grossly disproportionate" to the crime.'"]; *In re Lynch* (1972) 8 Cal.3d 410, 424 ["[A] punishment may violate [former] article I, section 6, of the [California] Constitution if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity."].)

In deciding whether a sentence violates the Eighth Amendment's cruel and unusual clause, "[the] court must begin by comparing the gravity of the offense and the severity of the sentence." (*Graham*, *supra*, 560 U.S. at p. 60.) "'[I]n the rare case in which [this] threshold comparison … leads to an inference of gross proportionality' the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. [Citation.]" (*Ibid.*; accord, *People v. Haller* (2009) 174 Cal.App.4th

1080, 1088; *People v. Meeks* (2004) 123 Cal.App.4th 695, 707.) "If this comparative analysis 'validate[s] an initial judgment that [the] sentence is grossly disproportionate,' the sentence is cruel and unusual. [Citation.]" (*Graham*, *supra*, at p. 60.)

In deciding whether a sentence violates article I, section 17 of the California Constitution, the court undertakes a tripartite analysis. "First, courts examine the nature of the offense and the offender, 'with particular regard to the degree of danger both present to society.' Second, a comparison is made of the challenged penalty with those imposed in the same jurisdiction for more serious crimes. Third, the challenged penalty is compared with those imposed for the same offense in other jurisdictions. [Citations.]" (*People v. King* (1993) 16 Cal.App.4th 567, 572; accord, *In re Lynch*, *supra*, 8 Cal.3d at pp. 425-427.) "The main technique of analysis under California law is to consider the nature both of the offense and of the offender." (*People v. Martinez* (1999) 76 Cal.App.4th 489, 494.) "The nature of the offense is viewed both in the abstract and in the totality of circumstances surrounding its actual commission; the nature of the offender focuses on the particular person before the court, the inquiry being whether the punishment is grossly disproportionate to the defendant's individual culpability, as shown by such factors as age, prior criminality, personal characteristics, and state of mind." (*Ibid.*)[22] "It is a rare case that violates the prohibition against cruel and/or unusual punishment." (*People v. Carmony* (2005) 127 Cal.App.4th 1066, 1072.)

We conclude defendant's sentence was not grossly disproportionate. In the abstract, "[t]here can be no dispute that murder is a serious crime, and that armed robbery and the use of a gun by a gang member in the commission of a crime present a significant degree of danger to society." (*Em*, *supra*, 171 Cal.App.4th at p. 972.) While defendant emphasizes that he was a juvenile at the time of the shooting, did not intend to kill

---

[22] Defendant focuses on this "main technique." (See *People v. Martinez*, *supra*, 76 Cal.App.4th at p. 494.) Consequently, we need only address this prong of the test. (See *Em*, *supra*, 171 Cal.App.4th at pp. 972-976.)

26.

Atilano, did not actually shoot Atilano, did not exert any control over the murder weapon, and was remorseful, the record—viewed in the light most favorable to the verdict—establishes that he was far from a passive bystander in the events leading up to Atliano's death. Defendant, an admitted Hoover, accompanied Smith, a fellow Hoover, to commit a robbery, thereby "providing integral assistance to the commission of the crime." (*Id.* at p. 975; see *People v. Gonzales* (2001) 87 Cal.App.4th 1, 16.) Before the men ever encountered Atilano, defendant became aware that Smith possessed a firearm, but chose not to withdraw. (See *Em*, *supra*, at p. 975; *People v. Gonzales*, *supra*, at pp. 16-17.) When defendant and Smith came across Atilano, who was sleeping by himself in his unlocked van, they decided to rob him. (See *Em*, *supra*, at p. 975.) After Smith shot Atilano without apparent provocation, defendant "provided no assistance to [Atilano]" and "le[ft] him to bleed to death." (*Ibid.*). These circumstances, together with evidence of defendant's prior criminality, justified the punishment dispensed.

## V.  Defendant's aggregate 50-years-to-life sentence did not violate equal protection[23]

Defendant was sentenced to 25 years to life (§ 190, subd. (a)), plus a consecutive 25 years to life for vicarious firearm discharge (§ 12022.53, subds. (d) & (e)(1)). He will become eligible for parole after he serves a minimum confinement period of 50 years. (§ 3046, subd. (b).)[24] Defendant contends that this sentencing "scheme" violates equal

---

[23]    We note that defendant failed to raise this constitutional challenge below. "All issues, even those involving an alleged constitutional violation, are subject to the rule of forfeiture, and a defendant's failure to raise the issue before the trial court will generally result in the appellate court's refusal to consider it." (*People v. Navarro* (2013) 212 Cal.App.4th 1336, 1347, fn. 9.) Notwithstanding this rule, we will consider the issue for the first time on appeal because the argument "[is] legal, [is] based on undisputed evidence, and center[s] on review of abstract and generalized legal concepts." (*Id.* at p. 1348.)

[24]    We highlight subdivision (b)(3) of section 3051, which reads:

"A person who was convicted of a controlling offense that was committed before the person had attained 18 years of age and for which the sentence is

27.

protection because—unlike juvenile homicide offenders sentenced to LWOP (§ 190.5, subd. (b))—he cannot petition the sentencing court for recall and resentencing pursuant to section 1170, subdivision (d)(2).[25]  We disagree.

a life term of 25 years to life shall be eligible for release on parole by the [Board of Parole Hearings] during his or her 25th year of incarceration at a youth offender parole hearing …."  (See *id.*, subd. (a)(2)(B) ["'Controlling offense' means the offense or enhancement for which any sentencing court imposed the longest term of imprisonment."].)

Under this provision, defendant will automatically become eligible for parole after his 25th year of incarceration instead of his 50th.  Section 3051 does not apply to juvenile offenders sentenced to LWOP.  (*Id.*, subd. (h).)

[25]    Section 1170, subdivision (d)(2), provides, in pertinent part:

"(A)(i)  When a defendant who was under 18 years of age at the time of the commission of the offense for which the defendant was sentenced to imprisonment for [LWOP] has served at least 15 years of that sentence, the defendant may submit to the sentencing court a petition for recall and resentencing.  [¶] … [¶]

"(B)  The defendant shall file the original petition with the sentencing court….  The petition shall include the defendant's statement that he or she was under 18 years of age at the time of the crime and was sentenced to [LWOP], the defendant's statement describing his or her remorse and work towards rehabilitation, and the defendant's statement that one of the following is true:

"(i)  The defendant was convicted pursuant to felony murder or aiding and abetting murder provisions of law.

"(ii)  The defendant does not have juvenile felony adjudications for assault or other felony crimes with a significant potential for personal harm to victims prior to the offense for which the sentence is being considered for recall.

"(iii)  The defendant committed the offense with at least one adult codefendant.

"(iv)  The defendant has performed acts that tend to indicate rehabilitation or the potential for rehabilitation, including, but not limited to, availing himself or herself of rehabilitative, educational, or vocational programs, if those programs have been available at his or her classification level and facility, using self-study for self-improvement, or showing evidence of remorse.  [¶] … [¶]                                          [*fn. cont'd on next page*]

28.

"The Fourteenth Amendment to the United States Constitution and article I, section 7, subdivision (a) of the California Constitution both prohibit the denial of equal protection of the laws." (*People v. Cruz* (2012) 207 Cal.App.4th 664, 674; see *ibid.* ["'The equal protection guarantees of [both Constitutions] are substantially equivalent and analyzed in a similar fashion ….'"].) "The constitutional guaranty of equal protection of the laws has been judicially defined to mean that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in like circumstances in their lives, liberty and property and in their pursuit of happiness." (*People v. Romo* (1975) 14 Cal.3d 189, 196.) "The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an

---

"(E)  If the court finds by a preponderance of the evidence that the statements in the petition are true, the court shall hold a hearing to consider whether to recall the sentence and commitment previously ordered and to resentence the defendant in the same manner as if the defendant had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence….  [¶] … [¶]

"(G)  The court shall have the discretion to recall the sentence and commitment previously ordered and to resentence the defendant in the same manner as if the defendant had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence.  The discretion of the court shall be exercised in consideration of the criteria in subparagraph (B)….

"(H)  If the sentence is not recalled, the defendant may submit another petition for recall and resentencing to the sentencing court when the defendant has been committed to the custody of the department for at least 20 years.  If recall and resentencing is not granted under that petition, the defendant may file another petition after having served 24 years.  The final petition may be submitted, and the response to that petition shall be determined, during the 25th year of the defendant's sentence.

"(I)  … [T]he court may consider any … criteria that the court deems relevant to its decision, so long as the court identifies them on the record, provides a statement of reasons for adopting them, and states why the defendant does or does not satisfy the criteria."

unequal manner." (*In re Eric J.* (1979) 25 Cal.3d 522, 530.) In other words, "an equal protection claim cannot succeed, and does not require further analysis, unless there is some showing that the two groups are sufficiently similar with respect to the purpose of the law in question that some level of scrutiny is required in order to determine whether the distinction is justified." (*People v. Nguyen* (1997) 54 Cal.App.4th 705, 714.)

We conclude defendant was not similarly situated to juvenile homicide offenders sentenced to LWOP. Defendant, who was found guilty of first degree felony murder and vicarious firearm discharge, but not special-circumstance murder, received a term-of-years sentence with a parole eligibility date that falls within his natural life expectancy. (See *ante*, fn. 24.) By definition, juvenile homicide offenders sentenced to LWOP—i.e., those convicted of special-circumstance murder—are ineligible for parole. (See *People v. Cooper* (1996) 43 Cal.App.4th 815, 828; *People v. Applin* (1995) 40 Cal.App.4th 404, 410 ["A defendant who has been convicted of one crime is not in the same position as a defendant who has been convicted of a different crime."].) Furthermore, section 1170, subdivision (d)(2), which applies to juvenile LWOP inmates, does not automatically restore parole eligibility. Rather, a qualifying prisoner must take the initiative and petition the sentencing court for recall and resentencing. At a subsequent hearing, the court, which may consider any criteria deemed relevant, may either recall the sentence and resentence the prisoner or deny the request. The prisoner may then repeat this process up to two more times with no guarantee of success. On the other hand, defendant's parole eligibility date is fixed and unequivocal. (Cf. *People v. Pecci* (1999) 72 Cal.App.4th 1500, 1503 ["Persons convicted of different offenses can be punished differently."].) The equal protection claim fails.

## **DISPOSITION**

The judgment is affirmed.

_____

DETJEN, J.

WE CONCUR

_____

LEVY, Acting P.J.

_____

PEÑA, J.

31.